201 P.3d 985 (2009)
2009 UT 4
STATE of Utah, in the interest of K.F., a person under eighteen years of age.
A.O., Appellant,
v.
State of Utah, Appellee.
No. 20070893.
Supreme Court of Utah.
January 23, 2009.
*988 K. Andrew Fitzgerald, Moab, for appellant.
Mark L. Shurtleff, Atty. Gen., John M. Peterson, Carol L.C. Verdoia, Asst. Atty's Gen., Salt Lake City, for appellee.
Martha M. Pierce, Salt Lake City, for the Office of the Guardian Ad Litem.

*989 On Certification from the Utah Court of Appeals
DURRANT, Associate Chief Justice:

INTRODUCTION
¶ 1 This case concerns a juvenile court order that changed a minor's ("K.F.") permanency goal from reunification with her mother ("mother") to individualized permanency with a concurrent goal of custody and guardianship. The mother appealed the juvenile court's order to the court of appeals, which then, on its own motion, certified the case for transfer to this court.
¶ 2 The mother raises six issues on appeal:
(1) whether the juvenile court had subject matter jurisdiction;
(2) whether the court order that changed K.F.'s permanency goal from reunification to individualized permanency constitutes a final order from which she may appeal as a matter of right;
(3) whether the evidence was sufficient for the juvenile court to determine that the mother failed to comply with the service plan and that the Division of Child and Family Services ("DCFS") made reasonable efforts to reunify K.F. with her mother;
(4) whether the mother was required to preserve a challenge to the adequacy of the juvenile court's findings to enable this court to address the issue on appeal;
(5) whether the juvenile court's findings were sufficiently detailed to facilitate meaningful appellate review; and
(6) whether the juvenile court should have applied the parental presumption.
¶ 3 The court of appeals certified the case based upon two of these issues that it believed warranted consideration by this court: whether the juvenile court order is final and appealable and whether we ought to revisit our holding in 438 Main Street v. Easy Heat, Inc.,[1] which requires parties to preserve in the trial court the adequacy of the court's findings of fact.
¶ 4 For the reasons detailed below, we affirm the juvenile court's order and hold that (1) the juvenile court had subject matter jurisdiction; (2) a permanency goal of individualized permanency is a final and appealable order; (3) the evidence was sufficient for the juvenile court to find that the mother failed to comply with her service plan and that DCFS made reasonable reunification efforts; (4) 438 Main Street is reaffirmed, and the mother's challenge to the adequacy of the detail in the juvenile court's findings is dismissed because she did not preserve the challenge; and (5) because the mother lost the parental presumption when she voluntarily placed K.F. in state custody, the juvenile court acted properly when it did not apply the parental presumption.

BACKGROUND
¶ 5 K.F. has been placed in state custody on two different occasions, first in 2003 and again in 2006. In 2003, the juvenile court determined K.F. was an "abused, neglected, and/or dependent" child based on stipulated findings that K.F.'s mother and father abused drugs in the home and the father committed acts of domestic violence. After a short period with her grandmother, K.F. was placed in foster care with the Smith family. Her permanency goal was set as reunification with her mother. Nearly a year later, the juvenile court ordered that K.F. be returned home, contingent upon her mother's compliance with several conditions, including that she receive protective supervision services ("protective services") from DCFS. DCFS continued protective services until July 22, 2005, whereupon the juvenile court entered an order staying protective services for the family.
¶ 6 In the summer of 2006, DCFS received a tip alleging that the mother was drinking in the home and neglecting her children. Based on these allegations, the State filed a motion to lift the stay of protective services. On October 18, 2006, the juvenile court held a hearing on the State's motion. At the hearing, the juvenile court noted that protective services had been stayed on the condition that K.F. complete counseling, which she *990 failed to do. In furtherance of its motion, the State pointed to the following: (1) the mother had recently begun individual counseling and received medication for depression based on an incident in which she cut herself to see if a man cared for her; (2) K.F., then age 12, had stayed out all night with a 19-year-old male, and while her mother knew K.F. was out all night with a male, her mother did not know his age; and (3) a registered sex offender was living in the family's home.[2] As a result, the juvenile court lifted the stay.
¶ 7 On October 23, 2006, the State filed a new, verified petition for custody alleging that K.F. was an "abused, dependent, and/or neglected child."[3] At a shelter hearing two days later, K.F. admitted allegations in the petition regarding her behavior. Because of K.F.'s ungovernable behavior, her mother voluntarily placed K.F. in state custody, on the condition that DCFS would again place K.F. with her former foster parents, the Smiths. Subsequently, the juvenile court ordered K.F.'s removal from her mother's home and placed K.F. in the interim custody of DCFS.[4]
¶ 8 On November 15, 2006, based on stipulated findings of fact, the juvenile court found that K.F. was beyond her mother's control and that removal from her mother's home was in K.F.'s best interest. Consequently, the court ordered K.F.'s removal, and she was placed again with the Smiths in foster care.
¶ 9 DCFS filed a service plan identifying K.F.'s permanency goal as reunification with her mother. The service plan required the mother to undergo drug testing and included a recommended counseling plan for K.F. The mother was also expected to be in contact with K.F. at least twice a week and participate in family therapy sessions with K.F. as recommended by the therapist.
¶ 10 Throughout the year, K.F. and her mother attended hearings at which the juvenile court found them in contempt of their service plans.[5] Nevertheless, K.F.'s permanency goal remained reunification with her mother.
¶ 11 On October 17, 2007, the juvenile court held a dispositional review/12-month hearing. The hearing was a full evidentiary hearing at which K.F.'s therapist, the mother, and DCFS case workers testified.
¶ 12 K.F.'s therapist, Tammy Roberts, testified that K.F. made only minimal progress with her mother because her mother made herself unavailable by moving out of the state and attending only three in-person therapy sessions, two of which were during the same weekend. Additionally, during their therapy sessions, K.F. and her mother discussed past incidents that had upset K.F., including K.F.'s claim that she had been sexually abused. In response to K.F.'s allegations, the mother indicated that the mother "must have been high" or was unaware of these incidents, but the mother responded to K.F. generally with shock and doubt. Nevertheless, Roberts believed that "things were starting to come out and ... that there was some work that they were starting to do, had the capacity to do, and that there would be a need for continued family therapy." At the time of the hearing, Roberts also believed that there was a "substantial risk of detriment to [K.F.'s] emotional well[-]being if she *991 returned to her home" without at least six more months of bimonthly counseling between K.F. and her mother. Roberts also indicated that she had tried her best to accommodate the mother's schedule so that therapy sessions could occur.
¶ 13 The mother testified that she knew that the therapist wanted her to participate in weekly family therapy sessions, but, since moving from Wyoming to Grand Junction, Colorado in January 2007, she was unable to travel to Salt Lake to participate in therapy sessions because of the financial burden associated with travel. Additionally, the mother's job, her other children's school schedules, and her own pregnancy, made it difficult for her to attend therapy sessions. Finally, despite her struggles, the mother claimed that she recognized her flaws and was in a better place in her life.
¶ 14 Jennifer Ruggeri, a DCFS caseworker, testified that in the beginning she was not aware of any financial difficulty the mother had, as the mother had been traveling from Wyoming to visit K.F. in Layton quite frequently. But after the mother moved to Grand Junction in January, she rarely visited K.F. and told Ruggeri that she could not afford to visit her daughter. Ruggeri testified that DCFS responded by offering assistance to enable the mother to visit K.F. and attend therapy sessions. Ruggeri further testified that "no matter how hard we tried to problem solve, there always was an obstacle that we just couldn't get past."
¶ 15 DCFS case worker Leone Besinger testified that the mother had indicated to her that she needed K.F. to be returned to the mother by October 1 because she could no longer afford to pay for K.F.'s foster care.
¶ 16 At the close of the hearing, the juvenile court found by a preponderance of the evidence that returning K.F. to her mother's home would "create a substantial risk of detriment to [K.F.'s] well[-]being and that [she] cannot be returned home." The court also found that there was prima facie evidence that the mother failed to comply with the court-ordered service plan, which failure created a substantial risk of detriment to K.F.'s well-being. Consequently, the juvenile court ordered that reunification efforts be terminated, and the court changed K.F.'s permanency goal from reunification with her mother to individualized permanency with a secondary goal of custody and guardianship. The juvenile court also ordered that DCFS continue engaging the mother in family therapy and reimburse her for travel expenses. The court noted that adoption is not an option for K.F. because she is 13 years old, she desires a relationship with her mother, and her mental health requires a relationship with her mother. The juvenile court declared that the purpose of family therapy "will not be one in which [K.F.] will return to live with her mother, but will be one that is focused on helping" K.F. resolve the issues she has with her mother. Further, the judge told K.F. at the end of the hearing that the focus would no longer be on reunification: "[M]y focus isn't [on] returning you home, and that won't be my focus when we have other hearings. And even if your mom engages in therapy, that won't be my focus."
¶ 17 The mother appealed this order to the court of appeals, and, on its own motion, the court of appeals certified this case for immediate transfer to this court. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(b) (2008).

STANDARDS OF REVIEW
¶ 18 We apply a correction of error standard, giving no deference to the juvenile court, in determining whether the juvenile court had subject matter jurisdiction.[6] We make an original determination regarding whether the court's permanency order is final and appealable.[7] We apply a clearly erroneous standard in determining whether the juvenile court's findings are based upon sufficient evidence.[8] In this area, "the juvenile court in particular is given a `wide latitude of discretion as to the judgments arrived *992 at' based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court judges' `special training, experience and interest in this field, and ... devoted ... attention to such matters.'"[9]
¶ 19 We overturn settled case law only when we are "clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent."[10] Finally, we apply strict scrutiny to the loss of the parental presumption.[11]

ANALYSIS
¶ 20 As threshold issues, we first address (1) whether the juvenile court had subject matter jurisdiction and then (2) whether the court's order is final and appealable. Because we hold that the court had subject matter jurisdiction and the order is final and appealable, we then reach (3) whether the court had sufficient evidence upon which to base its order, (4) whether we should overturn 438 Main Street v. Easy Heat, Inc.[12] to allow adequacy of findings challenges to be heard on appeal without preservation, and (5) whether the juvenile court should have applied a parental presumption. Because we uphold 438 Main Street, we do not reach the substance of the mother's unpreserved claim that the juvenile court's findings were inadequate to facilitate meaningful appellate review.

I. THE JUVENILE COURT HAD SUBJECT MATTER JURISDICTION
¶ 21 Whether subject matter jurisdiction exists is a threshold issue that we must resolve before we may address the appellant's substantive issues.[13] The mother contends that the juvenile court lacked subject matter jurisdiction and, therefore, the court's order is void. While she is correct that a judgment is void if the court that rendered it lacked subject matter jurisdiction,[14] we hold that the juvenile court had subject matter jurisdiction in this case because the mother voluntarily placed K.F. in state custody.
¶ 22 Utah Code section 78A-6-103(1)(c) provides that the juvenile court has exclusive jurisdiction in proceedings concerning a minor who has been abused, neglected, or is dependent. Before such proceedings may commence, the State must file a petition with the juvenile court that not only alleges that the minor has been abused, neglected, or is dependent, but also supports that allegation with "a concise statement of facts, separately stated."[15] In cases of abuse, neglect, or dependency, the juvenile court need not make findings of fact to establish its jurisdiction.[16]
¶ 23 In this case, the State filed a petition for custody on October 23, 2006, alleging that K.F. was an "abused, dependent and/or neglected child." The petition included facts regarding K.F.'s delinquent behavior, the mother's ignorance of that behavior, and the mother's inability to parent K.F. due in part to the mother's use of Xanax. In addition, the mother not only stipulated to these facts but also voluntarily placed K.F. in state custody. This establishes a sufficient basis for subject matter jurisdiction.
¶ 24 The mother argues that the stipulated findings did not indicate that she had abused *993 or neglected K.F., nor did they indicate that K.F. was dependent. But she did stipulate to the facts that supported the conclusion. Further, she stipulated that the court had "jurisdiction pursuant to the Juvenile Court Act of 1996." Therefore, subject matter jurisdiction was proper in the juvenile court.

II. AN ORDER SETTING A GOAL OF INDIVIDUALIZED PERMANENCY IS FINAL AND APPEALABLE
¶ 25 Next we consider whether the order changing K.F.'s permanency goal from reunification with her mother to individualized permanency is a final appealable order. We hold that an order of individualized permanency is a final appealable order and is appropriate in situations where there is a compelling reason to rule out goals of reunification, adoption, guardianship, and kinship placements. We reach this conclusion after a two-fold analysis: first, we analyze why individualized permanency is a legitimate permanency goal, then we turn to why an order setting a goal of individualized permanency is final and appealable.

A. Individualized Permanency Is a Legitimate Permanency Goal Only Where the Judge Who Sets the Goal Rules Out Statutory Alternatives and Supports the Goal With a Compelling Reason
¶ 26 While the mother and the State agree that the order ending reunification services and setting K.F.'s permanency goal as individualized permanency is final and appealable, the Guardian ad Litem ("GAL") argues that the order is not final and appealable, but rather interlocutory, because "it didn't even define what [K.F.'s] permanent status would be." The GAL further states that the goal of individualized permanency is not a permanent goal but rather one that must be "narrowed down to a specific permanent status." The GAL further describes individualized permanency as "foster care drift."
¶ 27 The term "foster care drift" describes situations wherein the temporary solution of foster care inadvertently becomes a permanent solution.[17] In these situations, a permanent goal for the child is never properly established.[18] But foster care drift, with all that the term implies, is not an appropriate way to describe all goals that effectuate long-term foster care. The Utah Legislature and the United States Congress have jointly provided guidelines for the rare circumstances wherein a permanency goal of long-term foster care, in this case labeled individualized permanency, is in the best interest of the child.
¶ 28 Recognizing there are circumstances in which more traditional goals of permanency are not appropriate, our legislature has stated that when there "is a compelling reason" that adoption, reunification, guardianship, or a kinship placement are not in the child's best interest, then "the court may order another planned permanent living arrangement in accordance with federal law."[19]
¶ 29 Federal law, in turn, recognizes the need for individualized permanency:
(3) If the State concludes, after considering reunification, adoption, legal guardianship, or permanent placement with a fit and willing relative, that the most appropriate permanency plan for a child is placement *994 in another planned permanent living arrangement, the State must document to the court the compelling reason for the alternate plan. Examples of a compelling reason for establishing such a permanency plan may include:
...
(ii) The case of a parent and child who have a significant bond but the parent is unable to care for the child because of an emotional or physical disability and the child's foster parents have committed to raising him/her to the age of majority and to facilitate visitation with the disabled parent....[20]
Thus, a goal of individualized permanency is in accordance with federal law when the court seeking to establish the goal (1) determines that reunification, adoption, guardianship, and a kinship placement are not available options, and (2) articulates a compelling reason for setting the goal of individualized permanency.
¶ 30 In this case, the juvenile court met these requirements. The court first ruled out the statutorily preferred permanency goals, beginning with reunification. After finding that the mother had not complied with her service plan, the court was statutorily required to rule out reunification,[21] which the court clearly did when it changed K.F.'s permanency goal and stated that its focus would no longer be on reunification. The court then determined that adoption was not an option because K.F. was 13 years old, she desired a relationship with her mother, and, based on expert testimony, K.F.'s mental health required a relationship with her mother.
¶ 31 The court then articulated a compelling reason to establish a goal of individualized permanency for K.F. K.F. was residing with a foster care family with whom she had spent considerable time. She not only lived with them for the year prior to the permanency hearing, but she also lived with the family at a previous time when she was in state custody. Assessing K.F.'s need to maintain a relationship with her mother despite the fact that the court could not reunite K.F. with her mother, the juvenile court established a goal of individualized permanency wherein K.F. will remain with her foster family and DCFS will continue engaging the mother in family therapy with K.F.[22]
¶ 32 These facts closely resemble the federal regulation's example of a situation wherein long-term foster care is in the child's best interestthe parent and child have a significant bond but reunification is impossible, and the child is living with a foster family that is committed to raising the child to majority and facilitating visitation between the parent and child.[23] For these reasons, we hold that the juvenile court's oral findings sufficiently stated a compelling reason to make individualized permanency a permanent goal for K.F.
¶ 33 Other jurisdictions have reached similar conclusions. California, reviewing similar facts, has held that long-term, potentially-permanent foster care complies with federal regulations:
Congress did not intend to dispense with long-term foster care as a placement when reunification efforts had failed but to encourage regular review of the status of foster children and permit creative solutions *995 for safe, permanent living arrangements for minors who could no longer reside with their parents. Of course, the periodic review of the foster care placement permits the state to adapt as circumstances change and consider permanent plans which might not have been available at the time reunification services were terminated.[24]
Vermont has also found that long-term foster care is appropriate when a child has a strong bond with a parent who is unable to raise the child.[25]
¶ 34 Having determined that individualized permanency is a legitimate permanent status and was properly ordered in this case, we turn to whether an order setting a goal for individualized permanency is a final order.

B. An Order Setting Individualized Permanency as a Minor's Permanency Goal Is a Final Appealable Order
¶ 35 An order is appealable as a matter of right if it is final.[26] All other orders may be appealed at the discretion of the appellate court as interlocutory appeals.[27]
¶ 36 To be final, a juvenile court order must "end[] the current juvenile proceedings, leaving no question open for further judicial action."[28]
[O]ur inquiry into whether an order leaves a question open for further judicial action is often unconcerned with the question of whether the juvenile court's jurisdiction over a minor continues beyond its entry of the order. Because "considerations regarding a child's welfare are rarely, if ever, static and because the child's environment is constantly evolving," the juvenile court frequently retains jurisdiction over cases after some of the issues have been finally resolved.[29]
Therefore, "the determining factor in deciding if an order is final and appealable is whether it effects a change in the permanent status of the child."[30] A permanent change in the child's status vis-a-vis the child's parent is sufficient.[31] Juvenile court orders that we have held are final and appealable include orders terminating parental rights;[32] orders that simultaneously end reunification services, terminate DCFS's custody, and return the children to their parents;[33] and orders "entered upon disposition of an adjudicated petition of abuse, neglect or dependency."[34]
¶ 37 Juvenile court orders that we have held are not final include shelter orders, which make an interim determination pending additional proceedings,[35] and orders that merely terminate reunification services and change the child's permanency goal to adoption[36]a goal that cannot be accomplished without further judicial action.
¶ 38 This case provides us the first opportunity to address whether an order resulting from a permanency hearing is final and appealable if the order terminates reunification services and changes a child's permanency goal to "individualized permanency." At issue is whether individualized permanency requires additional proceedings before the goal may be accomplished; that is, we must determine *996 whether setting a goal of individualized permanency effectuates a permanent change in the child's status. We hold that it does.
¶ 39 K.F.'s mother argues that the goal of individualized permanency set by the juvenile court at the permanency hearing effectively transferred permanent custody from her. Unlike a goal of adoption, further proceedings would not be necessary to effectuate the goal because the court specifically ordered that parental rights would not be terminated. Thus, the individualized permanency order is the only order from which she will be able to appeal the juvenile court's decision to terminate reunification efforts and keep K.F. in state custody.
¶ 40 The State agrees. It contends that the juvenile court's order effected a permanent change in K.F.'s status by potentially denying the mother custody of K.F. for the rest of K.F.'s minority. Further, the State observes that there likely is not another order from which the mother may appeal the juvenile court's decision to end reunification efforts in favor of long-term state custody of K.F.
¶ 41 The GAL, on the other hand, argues that individualized permanency is not a final order because it is subject to revision. Although the GAL is correct in saying that by its very nature individualized permanency is subject to revision, the GAL is incorrect in assuming that the goal will necessarily be revised. Its revision depends upon whether the relationship between the parent and the child substantially changes, leaving open the very real possibility that the relationship will not substantially change. Therefore, individualized permanency may remain the child's permanency goal throughout the child's minority when such a goal is in the best interest of the child.
¶ 42 As such, it is possible that the mother will not have another opportunity to appeal the court's order if we do not allow her to do so now. Perhaps in time, K.F.'s relationship with her mother will change in such a way to enable the juvenile court to re-examine the options of reunification or adoption. Certainly, "considerations regarding a child's welfare are rarely, if ever static" because "the child's environment is constantly evolving."[37] But considering the very real possibility that the relationship between the mother and K.F. may not substantially change, this order must be considered final for matters of appealability; otherwise, the mother may never have an opportunity to appeal this order.

III. THE JUVENILE COURT HAD SUFFICIENT EVIDENCE TO FIND THAT THE MOTHER FAILED TO COMPLY WITH HER SERVICE PLAN AND THAT DCFS PROVIDED REASONABLE REUNIFICATION EFFORTS
¶ 43 We now turn to the mother's substantive arguments. Specifically, she contends that the evidence was insufficient for the juvenile court to determine that she failed to comply with her service plan and that DCFS provided reasonable efforts to reunify her with K.F.[38]
¶ 44 We give the juvenile court wide discretion in evaluating evidence because of the court's opportunity to evaluate credibility firsthand and the court's training, experience, and interest in this area.[39] To overturn a finding of fact, we require the appellant to "marshal all the evidence in support of the finding and then demonstrate that the evidence is legally insufficient to support the finding when viewing it in a light most favorable to the court below."[40]

A. There Was Sufficient Evidence for the Juvenile Court to Determine That the Mother Failed to Comply With Her Service Plan
¶ 45 At the dispositional hearing, the juvenile court found that the mother had not *997 complied with her service plan because she attended only three family therapy sessions in twelve months. The mother contends that because her service plan did not specify a requisite number of therapy sessions she was to attend with K.F., the juvenile court should not have found that she failed to comply with the plan.
¶ 46 If, as here, a juvenile court finds by a preponderance of the evidence that returning a child to a parent would create a substantial risk of detriment to the child, the child may not be returned home.[41] Further, a parent's failure to comply with a service plan in whole or in part is prima facie evidence that returning a child to a parent would create a substantial risk of detriment to the minor.[42] But the court of appeals has said that "[w]here a service plan is not communicated to the parent, in effect, no plan has been provided. Thus, the State cannot rely on any alleged failure by the parent to comply with such a plan in considering later action."[43]
¶ 47 In this case, the service plan was communicated to the mother. The service plan indicated that K.F. and her mother "will participate in family therapy sessions if deemed necessary by the therapist." At trial, the family therapist testified that originally she recommended two family therapy sessions per month. She reduced her recommendation to a minimum of one session per month when two sessions proved problematic for the mother.
¶ 48 The mother contends that, despite the therapist's recommendation, DCFS did not articulate a requisite number of visits for her to attend in order to be reunified with K.F. Therefore, she argues, evidence that she attended only three sessions is insufficient to find that she failed to comply with her service plan. But there is sufficient evidence that the mother knew of the recommendations for family therapy. For example, she confirmed in her testimony that she was aware that the family therapist wished to have weekly sessions and that the mother knew it was important that she participate in person, not just by telephone.
¶ 49 The purpose of family therapy in this case was to assist K.F. and her mother in working through their issues so that K.F. could trust her mother and feel safe if she were to return home. K.F.'s therapist testified that there was a substantial risk of detriment to K.F.'s emotional well-being if she were to return home, due in part to the mother's failure to participate regularly in therapy. Therefore, the court had sufficient evidence before it to find that the mother's failure to attend more than three in-person family therapy sessions in twelve months constituted noncompliance with the service plan and prevented K.F. from resolving the issues that brought her into state custody.

B. There was Sufficient Evidence to Determine That DCFS Provided Reasonable Reunification Efforts
¶ 50 The mother further contends that because DCFS did not inform her of a specific number of therapy sessions that she needed to attend, there was insufficient evidence for the juvenile court to find that DCFS made reasonable reunification efforts.
¶ 51 Utah Code section 78A-6-312(2)(d)(i)(A) requires DCFS to make "reasonable efforts" to provide reunification services to a minor for a specified period of time. The juvenile court has the responsibility to determine whether the services offered constitute reasonable efforts.[44] A reasonable effort is "a fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights."[45] Reasonableness in this context is an objective standard *998 and depends upon a careful consideration of the facts of each individual case.[46]
¶ 52 Trial courts are in the best position to evaluate the credibility of witnesses, the parent's level of participation in reunification services, and whether services were appropriately tailored to remedy the problems that led to the child's removal. Consequently, determining whether DCFS provided "reasonable efforts" to reunify a parent with his or her child requires juvenile court judges to observe facts "relevant to the application of the law that cannot be accurately reflected in the record available to appellate courts."[47] Thus, appellate courts defer to juvenile courts on matters of credibility, and juvenile courts have broad discretion in determining whether reasonable reunification efforts were made.[48] Accordingly, "absent a demonstration that the determination was clearly in error, we will not disturb the determination."[49]
¶ 53 In State ex rel. A.C., the court of appeals held that DCFS had provided reasonable efforts to a father who failed to attend domestic violence treatment classes as required by his service plan because it was "ultimately [the] Father's responsibility to ensure that he completed the treatment plan, and he failed to do so."[50]
¶ 54 In this case, the mother bases her claim that DCFS did not make reasonable efforts to reunify her with K.F. on her previously addressed argument that DCFS never informed her that she needed to complete a certain number of therapy sessions before K.F. would be returned to her.
¶ 55 Although DCFS did not communicate a precise number of sessions she was required to attend to be eligible to reunite with her daughter, the mother was aware that frequent family therapy was an important part of her service plan. Further, the therapist and the DCFS worker testified that they worked diligently to arrange dates, times, and means so that the mother could be part of K.F.'s therapy on a regular basis. The therapist worked to accommodate the mother's schedule by holding sessions in the late evening and on weekends. DCFS workers testified that they had numerous conversations with the mother about assisting her financially so that she could visit her daughter frequently and participate in therapy sessions. DCFS workers further testified that when they learned of the mother's financial situation, they immediately went to work to figure out ways DCFS could help.
¶ 56 The mother put up roadblocks, however, to prevent successful completion of the service plan. For example, she moved out of the state, despite numerous warnings that this could compromise reunification efforts. After moving, she did not attend therapy sessions because she alleged that she could not afford the cost of travel, but once she explained this to DCFS, they offered to reimburse her for travel costs. Moreover, DCFS testified that as soon as they got past one barrier, the mother would always identify another. Consequently, the mother made only two visits to see her daughter in the ten months after the mother moved to Grand Junction.
¶ 57 This evidence was sufficient for the juvenile court to determine that DCFS provided reasonable efforts to reunify K.F. with her mother but that the mother failed to comply with the service plan. Therefore, we will not disturb the juvenile court's finding that DCFS provided reasonable reunification efforts.

IV. WE REAFFIRM 438 MAIN STREET AND, ACCORDINGLY, DO NOT REACH THE MOTHER'S CLAIM THAT THE FINDINGS WERE INADEQUATELY DETAILED BECAUSE SHE FAILED TO PRESERVE IT
¶ 58 In her brief, the mother argues that the juvenile court's findings of fact were inadequately detailed. She acknowledges, however, that she did not object on *999 this ground during or after the permanency hearing.
¶ 59 Our holding in 438 Main Street v. Easy Heat, Inc. requires a party to challenge in the trial court the adequacy of the court's factual findings to preserve an adequacy of the findings issue for appeal.[51] Under a 438 Main Street analysis, the mother clearly did not preserve a challenge to the adequacy of the juvenile court's findings. She does not contest this conclusion. Nevertheless, the mother contends that she was not required to preserve the issue for appeal because, as she views it, the holding in 438 Main Street contradicts rule 52 of the Utah Rules of Civil Procedure. To support her contention, she cites the court of appeals' opinion, In re K.H., in which that court described 438 Main Street as "problematic," "hyper technical," and imposing an "unduly heavy burden on counsel."[52]
¶ 60 We take this opportunity to clarify and reaffirm our decision in 438 Main Street. The requirement that a party raise a challenge to the adequacy of the findings of fact at the trial court before the challenge may be heard on appeal does not conflict with rule 52 of the Utah Rules of Civil Procedure, which provides in relevant part as follows:
(a) ... Requests for findings are not necessary for purposes of review.
(b) ... When findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the district court an objection to such findings or has made either a motion to amend them, a motion for judgment, or a motion for a new trial.[53]
Clearly, rule 52 addresses sufficiency of the evidence challenges. In 438 Main Street, however, we addressed challenges to the adequacy of the detail in the findings of fact. There we stated that a plaintiff "waive[s] any argument regarding whether the district court's findings of fact were sufficiently detailed" when the plaintiff fails to challenge the detail, or adequacy, of the findings with the district court.[54]
¶ 61 A challenge to the adequacy of the court's findings is notably different from a challenge to the sufficiency of evidence. "It is one thing for a party to say that the judge's findings are erroneous because they are contrary to or unsupported by the evidence, and quite another to say that the findings are insufficiently detailed."[55] It would be superfluous to demand that a party challenge the evidentiary support for a court's findings shortly after the court articulates them. But it is quite a different matter and wholly necessary for a party to challenge and thus afford the trial court "an opportunity to correct the alleged error" of inadequately detailed findings in order to provide for meaningful appellate review of the court's decision.[56]
¶ 62 As we noted in 438 Main Street, we can envision situations where "a court's findings could be adequately supported by the evidence but nevertheless insufficiently detailed to disclose the steps by which the judge reached his or her conclusions."[57] The reasoning behind the distinction is that
[i]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue. This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding.[58]
A trial court judge has the opportunity to address the sufficiency of the evidence to support the findings in his or her judgment. But a trial judge does not have the chance to *1000 address the adequacy of the findings themselves, unless that issue is brought before him or her. Therefore, requiring a party to object to the adequacy of the detail of the trial court's findings before appeal allows the trial judge to address and correct, if necessary, the level of detail in his or her findings before the case moves forward.
¶ 63 Judicial economy would be disserved if we permitted a challenge to the adequacy of the detail in the findings to be heard for the first time on appeal. Not only is an error in the detail in the findings easy for a trial judge to correct, but it is an error that is best corrected when the judge's findings are fresh in the judge's mind. Further, it is a waste of judicial resources for an appellate court to entertain such a challenge when the only likely remedy is merely a remand to the trial court for more detailed findings. We decline to offer such a remedy unless the petitioner first provided the trial court the opportunity to correct the error.
¶ 64 Accordingly, we affirm 438 Main Street, and we decline to address the mother's challenge to the detail of the juvenile court's findings because she did not preserve the issue for appeal.

V. THE MOTHER LOST HER PARENTAL PRESUMPTION WHEN SHE VOLUNTARILY PLACED K.F. IN STATE CUSTODY
¶ 65 The mother argues that the juvenile court erred when the court changed K.F.'s permanency plan to individualized permanency without considering her parental presumption. Although the record does not indicate that the juvenile court explicitly considered the mother's parental presumption when the court decided to terminate reunification efforts, the mother lost the presumption when she voluntarily placed K.F. in state custody the year before.
¶ 66 Utah law recognizes that in a custody dispute between a parent and a non-parent, there is a presumption that it is in the best interest of the child to be under the care, custody, and control of the child's natural parent.[59] It has been recognized that "every natural parent has a right to rely on the parental presumption to prevent the transfer of his or her child's custody to a nonparent, unless the presumption has been rebutted or otherwise lost."[60] If the parental presumption is overcome, the parent and non-parent "compete on equal footing" and the court will consider other factors when determining custody.[61]
¶ 67 In Hutchison v. Hutchison, we held that the presumption may be rebutted by evidence demonstrating that the parent lacks all three of the characteristics giving rise to the presumption: (1) that no strong mutual bond exists, (2) that the parent has not demonstrated a willingness to sacrifice his or her own interest and welfare for the child's, and (3) that the parent lacks the sympathy for and understanding of the child that is characteristic of parents generally.[62]
¶ 68 The parental presumption is lost where a parent has had his or her parental rights terminated or has previously lost custody of a child.[63] The "loss of custody, whether temporary or permanent, must be the result of a final factual determination on the merits of an underlying petition."[64] The loss of the parental presumption denies the parent the right "to reassert the parental presumption at a later date unless custody has since been restored to the parent."[65]
¶ 69 The parental presumption does not apply, as the court of appeals has correctly held, to cases "brought before the *1001 [juvenile] court on abuse, neglect, or dependency petitions."[66] In such cases, the petition alone is sufficient to overcome the parental presumption for purposes of adjudicating the allegations in the petition.[67]
¶ 70 In Davis v. Davis, the court of appeals concluded that by signing a custody stipulation that only reserved visitation, the father had implicitly agreed that his parental presumption had been rebutted and that the best interests of the child dictated that he not receive custody.[68] We agree. The parental presumption does not apply to a parent who has lost or voluntarily relinquished custody of his or her child. We need not, therefore, address whether the mother's presumption was rebutted under the Hutchison analysis because she lost her presumption when she voluntarily placed K.F. in state custody.

CONCLUSION
¶ 71 We hold that the juvenile court had subject matter jurisdiction to issue a permanency order for K.F.; the court's order terminating reunification and setting a goal of individualized permanency is final and appealable; the juvenile court had sufficient evidence upon which to base findings that the mother failed to comply with her service plan and that DCFS made reasonable efforts to reunify K.F. with her mother; the mother failed to preserve a challenge to the adequacy of the findings, as required by 438 Main Street; and because the mother lost the parental presumption when she voluntarily placed K.F. in state custody, the juvenile court was correct in not applying the parental presumption.
¶ 72 Affirmed.
¶ 73 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT'S opinion.
NOTES
[1] 2004 UT 72, 99 P.3d 801.
[2] The mother claimed that the offender told her that his conviction had been overturned. However, the offender had been convicted of having sex with a 14-year-old girl when he was 26.
[3] The State based the petition on allegations that K.F. refused to stay home at night, associated with older boys and girls, took her mother's car joyriding, was cited for possession of tobacco and curfew violation, stole money and credit cards, smoked cigarettes, mistreated her younger siblings, and had several boyfriends over the age of 16 years. In addition, the petition alleged that the mother's use of Lortab and Xanax prevented her from properly caring for K.F. When the police notified the mother that K.F. had taken the mother's car, the mother indicated that she had taken a Xanax pill and was never aware the car was gone.
[4] K.F. was also ordered to complete 119 hours of community service, submit to random drug testing, and attend an END tobacco cessation class.
[5] The mother was found to have violated her service plan because she failed to call in for drug testing. K.F. was found to have violated her service plan because she stole from a teacher and was communicating with older males via the internet.
[6] Suazo v. Salt Lake City Corp., 2007 UT App 282, ¶ 5, 168 P.3d 340.
[7] State ex rel. S.M., 2007 UT 21, ¶ 15, 154 P.3d 835.
[8] In re E.R., 2001 UT App 66, ¶ 11, 21 P.3d 680.
[9] Id. (quoting In re F.D., 14 Utah 2d 47, 376 P.2d 948, 951 (1962)).
[10] Laney v. Fairview City, 2002 UT 79, ¶ 45, 57 P.3d 1007 (citation and internal quotation marks omitted).
[11] Utah Code Ann. § 62A-4a-201(1)(b) (Supp. 2008).
[12] 2004 UT 72, 99 P.3d 801.
[13] Ameritemps, Inc. v. Labor Comm'n, 2005 UT App 491, ¶ 10, 128 P.3d 31.
[14] Brimhall v. Mecham, 27 Utah 2d 222, 494 P.2d 525, 526 (1972).
[15] Utah Code Ann. § 78A-6-304(4)(c) (2008).
[16] Id. § 78A-6-117(1)(a) (2008) ("The court shall make a finding of the facts upon which it bases its jurisdiction over the minor. But in cases within the provisions of Subsection 78A-6-103(1), findings of fact are not necessary.").
[17] See, e.g., Del A. v. Roemer, 777 F.Supp. 1297, 1313 (E.D.La.1991) (stating that foster care drift "refers to children still in the foster care system after many years because permanent goals were not established, maintained and carried out"); In re R.D.B., 282 Ga.App. 628, 639 S.E.2d 565, 569 (2006) ("The policy of the law as outlined in its statutes addressing children and foster care is to eliminate foster care drift and promote stability and permanence for children whose parents are unable or unwilling to provide for them. To allow this child to continue in foster care awaiting the possibility that one day her parents may be fit and she would then be wrenched from the care and concern of responsible foster parents... would be a cruel response to this child's need and expectation of having from society a home environment free of abuse and neglect regardless of her status at birth. To await the parents['] possible fitness and leave this child with such an unstable future is likely to cause serious physical, mental, emotional, or moral harm to her.").
[18] Del A., 777 F.Supp. at 1313.
[19] Utah Code Ann. § 62A-4a-205(9)(b) (Supp. 2008) (stating that there is an exception to the goals of adoption, reunification, guardianship, and kinship placement as described by Utah Code section 78A-6-306(6)(e)).
[20] 45 C.F.R. § 1356.21(h)(3) (2008). Although federal law is not binding in this area, Utah chooses to follow it in order to receive federal financial participation for foster care payments. 45 C.F.R. § 1356.21(a) ("To be eligible to receive Federal financial participation (FFP) for foster care maintenance payments ..., a State must meet the requirements of this section...."); see also Utah Code Ann. § 62A-4a-105(6) (requiring DCFS to "promote and enforce state and federal laws enacted for the protection of abused, neglected, dependent, delinquent, ungovernable, and runaway children, and status offenders, in accordance with the requirements of this chapter"); Utah Admin. Code r. 512-2-2 (2008) ("The Division of Child and Family Services adopts the following federal requirements applicable to Title IV-E Foster Care, Adoption, and Independent Living ... 45 CFR Part 1356, as updated through October 1, 1996....").
[21] Utah Code Ann. § 78A-6-314(2)(a)-(b).
[22] The court indicated that the purpose of family therapy "will not be one in which [K.F.] will return to live with her mother, but will be one that is focused on helping the child to overcome" the issues she has with her mother.
[23] 45 C.F.R. § 1356.21(h)(3)(ii).
[24] In re Stuart S., 104 Cal.App.4th 203, 127 Cal. Rptr.2d 856, 859 (2002) (discussing 45 C.F.R. § 1356.21 (2002)).
[25] In re A.G., 178 Vt. 7, 868 A.2d 692, 700 (2004) (stating that long-term foster care provided the child with permanency and complied with the statute requiring that the court first rule out reunification, adoption, guardianship, and a kinship placement).
[26] Utah R.App. P. 3(a).
[27] Id. at 5.
[28] State ex rel. M.W., 2000 UT 79, ¶ 25, 12 P.3d 80.
[29] State ex rel. S.M., 2007 UT 21, ¶ 18, 154 P.3d 835 (quoting State ex rel. E.M., 922 P.2d 1282, 1284 (Utah Ct.App.1996)).
[30] In re A.F., 2007 UT 69, ¶ 3, 167 P.3d 1070.
[31] Id. (quoting In re W.A., 2002 UT 127, ¶ 22, 63 P.3d 607).
[32] Id.
[33] S.M., 2007 UT 21, ¶¶ 1, 17, 154 P.3d 835.
[34] M.W., 2000 UT 79, ¶ 26, 12 P.3d 80.
[35] In re M.V., 937 P.2d 1049, 1051 (Utah Ct.App. 1997).
[36] A.F., 2007 UT 69, ¶ 7, 167 P.3d 1070.
[37] S.M., 2007 UT 21, ¶ 18, 154 P.3d 835 (citation and internal quotation marks omitted).
[38] The mother did not preserve this issue in the juvenile court, but pursuant to rule 52 of the Utah Rules of Civil Procedure, she is not required to do so because this action was tried by the court, not a jury.
[39] See State ex rel. S.M., 2007 UT 21, ¶ 12, 154 P.3d 835.
[40] Wilson Supply v. Fradan Mfg. Corp., 2002 UT 94, ¶ 21, 54 P.3d 1177.
[41] Utah Code Ann. § 78A-6-314(2)(b) (2008).
[42] Id. § 78A-6-314(2)(c).
[43] In re M.E.C., 942 P.2d 955, 958 (Utah Ct.App. 1997), superseded by statute on other grounds, State ex rel. T.M., 2003 UT App 191, ¶ 18, 73 P.3d 959.
[44] Utah Code Ann. § 78A-6-312(2)(d)(ii)(A).
[45] In re A.C., 2004 UT App 255, ¶ 14, 97 P.3d 706 (stating that the court of appeals uses the dictionary definition of "reasonable" and "efforts" to come to its definition of the term "reasonable efforts").
[46] Id.
[47] Id. ¶ 10.
[48] Id. ¶ 12.
[49] Id. ¶ 20 (emphasis added).
[50] Id. ¶ 17.
[51] 2004 UT 72, ¶ 56, 99 P.3d 801.
[52] In re K.H., 2004 UT App 483, ¶ 10 n. 5, 105 P.3d 967.
[53] Utah R. Civ. P. 52(a)-(b) (emphasis added).
[54] 438 Main St., 2004 UT 72, ¶ 56, 99 P.3d 801.
[55] Id. ¶ 54.
[56] Id.
[57] Id.
[58] Id. ¶ 51 (citations and internal quotation marks omitted).
[59] See In re J.M.V., 958 P.2d 943, 947 (Utah Ct.App. 1998); see also Troxel v. Granville, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).
[60] In re H.R.V., 906 P.2d 913, 917 (Utah Ct.App. 1995).
[61] Hutchison v. Hutchison, 649 P.2d 38, 41 (Utah 1982).
[62] Id.
[63] State ex rel. M.W., 2000 UT 79, ¶ 18, 12 P.3d 80.
[64] Id.
[65] S.V., 906 P.2d at 917 (emphasis added).
[66] In re J.M.V., 958 P.2d 943, 948 (Utah Ct.App. 1998).
[67] Id.
[68] 2001 UT App 225, ¶ 10, 29 P.3d 676.