2010 UT 19

**Denise STALEY, Plaintiff and Respondent,**

v.

**Christopher Jolles, M.D.; and NORTHERN UTAH HEALTHCARE CORPORATION dba ST. MARK'S HOSPITAL, Defendants and PETITIONERS.**

**No. 20080492.**

Supreme Court of Utah.

March 26, 2010.

---

David A. Cutt, Jordan P. Kendell, Salt Lake City, for plaintiff.

Jennifer Ries–Buntain, Eric P. Schoonveld, Mark A. Riekhof, Hugh C. Griffin, Salt Lake City, for defendants.

NEHRING, Justice:

## INTRODUCTION

¶ 1 This interlocutory appeal requires us to decide whether redacted medical information, which may only be reviewed by a limited number of people, offends the policies of the physician-patient privilege outlined in Utah Rule of Evidence 506. We hold that it does not and affirm the district court's ruling.

## FACTS AND PROCEDURAL HISTORY

¶ 2 On April 10, 2003, appellee Denise Staley underwent a hysterectomy at St. Mark's

Hospital, a facility located in Salt Lake City, Utah, and owned by appellant Northern Utah Healthcare Corporation. Following surgery, Ms. Staley was sent to floor Four West for postoperative recovery. During the evening of April 11, and while on floor Four West, Ms. Staley was cared for by registered nurse Angela Stallings. Ms. Stallings had an additional six patients assigned to her during that same evening.

¶ 3 St. Mark's nursing guidelines suggest a minimum of six registered nurses be on duty if there are thirty-four patients to a floor. These guidelines also provide that if a patient's systolic blood pressure drops below 90 points, the patient's assigned nurse should report that drop to the patient's physician. Four West was staffed with only five registered nurses and had a total of thirty-four patients from the evening of April 11, at 11:00 p.m., until April 12, at 7:00 a.m. During the same evening, Ms. Staley's systolic blood pressure dropped from 132 to 86 points between the hours of 6:15 p.m. and 2:00 a.m. Ms. Staley's physician was never notified.

¶ 4 Ms. Staley claims Ms. Stallings was negligent and that St. Mark's knowingly and recklessly understaffed floor Four West. Ms. Staley claims that because of this understaffing Ms. Stallings was unable to adequately monitor and prevent permanent damage to Ms. Staley's kidneys, which resulted from the low blood pressure. To support her negligent staffing claim, Ms. Staley requested documentation reflecting the acuity of the other patients assigned to Ms. Stallings during the evening following Ms. Staley's surgery. Patient acuity refers to the amount of nursing care a patient requires. After a series of discovery motions, St. Mark's was ordered to produce either a chart reflecting the acuity of Ms. Stallings' patients or a statement discussing how patient acuity is assessed and communicated on floor Four West. St. Mark's chose the latter.

¶ 5 In response to the order, St. Mark's produced an affidavit of registered nurse How–Su Chen, the nursing manager for floor Four West. Ms. Chen explained in her affidavit that patient acuity involves multiple factors including the patient's medical diagnosis and multiple patient needs that change from shift to shift. Ms. Chen also indicated that she had personally reviewed the six patient charts assigned to Ms. Stallings during the evening of April 11, and that in her opinion, Ms. Stallings' assignment was an appropriate staffing decision.

¶ 6 Ms. Staley then requested the six patient charts. Ms. Staley argued that it would be unfair and contrary to discovery for Ms. Chen to have access to the six patient charts without providing Ms. Staley an opportunity to review the records herself. St. Mark's refused to produce the six patient charts, arguing that they fall under the physician-patient privilege found in Utah Rule of Evidence 506(b). To overcome this physician-patient privilege, Ms. Staley has stipulated to redaction of all personal identifying information from the six patient charts as well as limiting review of the records to only attorneys and experts. St. Mark's rejected this stipulation, which resulted in a discovery hearing before the district court.

¶ 7 The district court noted that the question of redaction in the context of a physician-patient privilege is one of first impression in Utah. After analyzing the policies underlying the physician-patient privilege, and following the review of sister jurisdictions' treatment of the issue, the district court ordered St. Mark's to produce the six patient charts for redaction and limited review, holding that such a course would take the medical information out of the privilege altogether.

¶ 8 St. Mark's timely filed this interlocutory appeal pursuant to rule 5 of the Utah Rules of Appellate Procedure. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j).

## STANDARD OF REVIEW

¶ 9 "The existence of a privilege is a question of law for the court, which we review for correctness, giving no deference to the trial court's determination." *Moler v. CW Mgmt. Corp.*, 2008 UT 46, ¶ 7, 190 P.3d 1250 (internal quotation marks omitted).

## ANALYSIS

¶ 10 Stripped to their essence, St. Mark's contentions on appeal are: (1) that the physician-patient privilege found in rule 506 of the Utah Rules of Evidence permits neither redaction nor restricted review of medical files; (2) that even if redaction were allowed, the patient files would be only marginally relevant to Ms. Staley's negligent staffing claim and therefore would not overcome St. Mark's interest in protecting patient privacy; and (3) that Ms. Staley's negligent staffing claim has no independent viability and is merely a reformulation of her negligence claim.

¶ 11 Ms. Staley counters by pointing to the plain language and policy of rule 506, which, in her view, permits redaction and restricted access to medical records like that approved by the district court. Next, Ms. Staley asserts the medical records are very relevant, bearing directly on her claim that too few nurses were assigned to her floor on the night she suffered kidney damage.

## I. THE PHYSICIAN–PATIENT PRIVILEGE IS NOT IMPLICATED IF THE RECORDS ARE ADEQUATELY REDACTED

■ ¶ 12 The first issue before us is whether the physician-patient privilege applies to the medical records requested by Ms. Staley. Ms. Staley argues that when the documents sought were scrubbed of information that might identify the patient, and when access to the redacted documents was restricted, the physician-patient privilege no longer applied. In the alternative, Ms. Staley argues that the exception found in rule 506(d)(1) should include medical conditions of non-litigants.

¶ 13 St. Mark's reasons that since the text of rule 506 says nothing about redaction, and moreover, the enumerated exceptions to rule 506(b) are to be strictly construed, any redaction cannot change the privileged character of the records. St. Mark's also argues that rule 506(d)(1), excepting from the privilege physician-patient communications when a patient's "condition is an element of any claim or defense," applies only to patients who are parties and not to a condition of a non-litigant.

■ . ¶ 14 "We interpret court rules, like statutes and administrative rules, according to their plain language." *Burns v. Boyden,* 2006 UT 14, ¶ 19, 133 P.3d 370. "Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . ." Utah R. Civ. P. 26(b)(1) (emphasis added). Rule 506 of the Utah Rules of Evidence creates the physician-patient privilege. It states, in part:

> If the information is communicated in confidence and for the purpose of diagnosing or treating the patient, a patient has a privilege, during the patient's life, to refuse to disclose and to prevent any other person from disclosing (1) diagnoses made, treatment provided, or advice given, by a physician or mental health therapist, (2) information obtained by examination of the patient, and (3) information transmitted among a patient, a physician or mental health therapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or mental health therapist. . . .

Utah R. Evid. 506(b). Certain exceptions to the privilege exist under rule 506(d). Otherwise privileged communications will become discoverable in three specifically enumerated situations: (1) when a patient's condition is "an element of any claim or defense"; (2) when "proceedings to hospitalize the patient for mental illness" are being conducted; or (3) when communications of a "physical, mental, or emotional condition of a patient" are "made in the course of" and are "pertinent to the purpose of a court-ordered examination." Utah R. Evid. 506(d)(1)-(3).

¶ 15 On appeal, the parties have focused their arguments on how the exceptions to the physician-patient rule have been interpreted and applied. We find, however, that this appeal is best resolved by examining the general meaning, scope, and intent of rule 506. *See State v. Rothlisberger,* 2006 UT 49, ¶ 15, 147 P.3d 1176 ("Our objective in inter-

preting a court rule is to give effect to the intent of the body that promulgated it.")

¶ 16 Rule 506 shields from disclosure certain information communicated between a physician or a mental health therapist and a patient, so long as the information "is communicated in confidence" and for the purpose of diagnosis and treatment of the patient. Utah R. Evid. 506(b). Under rule 506, communicating information contemplates an exchange of information between a physician and a patient. In short, to be operative, rule 506 requires two actors—a patient and a physician, and an exchange of confidential information concerning a particular subject matter—diagnosis and treatment. All of these elements must be present for the privilege to be activated; mere descriptions of diagnoses and treatments that make no reference to a patient are ineligible for protection under rule 506. Indeed, the presence of identifying information and the orders of the court are what make the information privileged. Without an identified individual connected to a diagnosis, the diagnosis contains nothing more than medical terminology. The United States District Court for the Southern District of New York cogently explained this concept:

> that any record containing a diagnosis, an evaluation or a treatment, even if it cannot be connected with a patient, is privileged— is not self evident.... [O]ne might argue, as a matter of theory, that the use of the disjunctive in the [rule] means that any document containing a patient's identity or diagnosis or evaluation or treatment is privileged.... Such a construction, however, would lead to preposterous results. A scrap of paper upon which a physician had jotted down a patient's name, or wrote only the word "indigestion" (a diagnosis) or "aspirin" (a treatment) or "malingering" (an evaluation) would, or at least could, be privileged. The ... rulemakers could not possibly have so intended.

*In re Rezulin Prods. Liab. Litig.*, 178 F.Supp.2d 412, 414 (S.D.N.Y.2001). Other jurisdictions have adopted similar positions. *See, e.g., Ziegler v. Superior Court*, 134 Ariz. 390, 656 P.2d 1251, 1255 (Ariz.Ct.App.1982) (holding that a privilege extends only so far

as the patient could be identified through the records produced); *Rudnick v. Superior Court*, 11 Cal.3d 924, 114 Cal.Rptr. 603, 523 P.2d 643, 650 n. 13 (1974) ("[I]f disclosure reveals the ailments but not the patient's identity, then such disclosure would not appear to violate the [physician-patient] privilege"); *But see Binder v. Superior Court*, 196 Cal.App.3d 893, 242 Cal.Rptr. 231, 233–34 (1987) (holding that *Rudnick* did not apply to photographs of patients, even if the patients could not be identified in the photographs); *Baptist Mem'l Hosp.-Union County v. Johnson*, 754 So.2d 1165, 1168–71 (Miss. 2000) ("[T]he privilege must be interpreted in sensible accommodation to the aim of a just result" and thus, in some circumstances adequate safeguards, such as redaction or in camera review may be employed to protect patient confidentiality.).

¶ 17 St. Mark's holds fast to the view that "once a protected communication, always a protected communication." Because no express authorization for redaction appears in the rule, St. Mark's contends that the rule will not tolerate the alteration by redaction of otherwise privileged communications for the purpose of removing them from the ambit of rule 506. St. Mark's claims to find support for this view in our observation that rule 506 should be "strictly construed." *Burns v. Boyden*, 2006 UT 14, ¶ 17, 133 P.3d 370. St. Mark's reliance on *Burns* is unwarranted and we find its strict construction argument inapplicable to this case.

¶ 18 *Burns* involved a state investigation into allegedly fraudulent insurance billing practices of a chiropractor. *Id.* ¶ 2. During the investigation, the State served Dr. Burns with a subpoena duces tecum seeking all medical and billing information for over 300 patients. *Id.* ¶ 5. Dr. Burns moved to quash the subpoena by raising the physician-patient privilege in rule 506(b). On appeal, Dr. Burns argued that under rule 506(c), he had the right as a physician to raise the privilege on behalf of his patients. *Id.* ¶ 17. The State argued that a separate exception to the physician-patient privilege, supplementing the exceptions already enumerated in rule 506(d), should exist to permit access to records, otherwise privileged, if sought in aid of

an insurance fraud investigation. *Id.* ¶ 8. This court held that the physician-patient privilege and its enumerated exceptions should be "strictly construed," that "rule 506 contain[ed] only three explicit exceptions," and that accordingly, the court would not "create a blanket insurance fraud exception" because such a result "would run directly counter to the intent that exceptions be 'specifically enumerated.' " *Id.* ¶¶ 17–18.

¶ 19 St. Mark's situation can be distinguished from that of the parties in *Burns.* In *Burns,* the State sought not just the medical billing charts of all the patients Dr. Burns had treated, but also the names associated with those charts. The records in *Burns* were clearly privileged under rule 506 because they contained identifying information. The controversy in this case is different because Ms. Staley does not seek the names or other personal identifying information of the patients.

¶ 20 Furthermore, it is not clear to us how a "strict construction" of rule 506 aids St. Mark's. As a general proposition, the effect of "strictly construing" a rule or statute is to restrict its application. In *Burns,* we declined to create, by judicial fiat, an exception to rule 506 to exclude from the physician-patient privilege records sought in connection with an insurance fraud investigation. *See id.* ¶ 18. We had no occasion, however, to strictly construe rule 506 to reach this conclusion. Instead, we relied on the unambiguous language of the committee's note to rule 506 indicating that exceptions to the rule should be "specifically enumerated" to reject the State's claim that the exception it sought could be appended to the rule. *Id.* To remove a communication from the physician-patient privilege by removing from it the possibility that the communication might be traced to the patient who made the communication does not require the creation of a new exception to the rule and is compatible with the purpose and intent of the privilege protection.

¶ 21 Next, St. Mark's argues that redacting the records would not encourage full patient disclosure. Specifically, St. Mark's argues that due to the sensitive nature of one's medical records, a patient's candid disclosure could be chilled if the patient believes there is a possibility of being identified even after redaction.

¶ 22 The evidentiary rule of the privilege was meant to "foster[ ] candor in important relationships by promising protection of confidential disclosures." Utah R. Evid. 501 advisory committee's note 1. Accordingly, we have found that "[t]he purpose of the [physician-patient] privilege is to promote full disclosure within a physician-patient relationship and thereby facilitate more effective treatment." *Burns,* 2006 UT 14, ¶ 10, 133 P.3d 370. We have also held that "[t]he privilege serves to alleviate patients' fear that their medical records could be disclosed to the public and cause them embarrassment." *Id.* Hence, the physician-patient privilege is concerned with (1) promoting discourse between the physician and the patient and (2) protecting the right to keep private, intimate medical information outside of public view. Although we have no control over individual beliefs, in this instance we are confident that patients will have little fear that confidential communications in redacted records will be disclosed when the redactions have been reviewed by a judge charged with the task of examining the redacted records to confirm that, in fact, no identifying content remains.

¶ 23 We acknowledge that skepticism of redaction may be a concern of some patients, and that some states have relied on this concern in fashioning their own rules of physician-patient privilege. *See, e.g., In re Columbia Valley Reg. Med. Ctr.,* 41 S.W.3d 797, 802 (Tex.Ct.App.2001) (prohibiting any disclosure of information even after redaction of personal information). We have confidence, however, that redaction can adequately prevent patient identification and that where it does so, the privilege's purpose of fostering full disclosure by patients will survive unimpaired. However, an underlying premise to upholding redaction and limited review is that patient identification will be impossible. Whether and under what circumstances redaction can make good on its promise of anonymity depends on the circumstances of each case.

¶ 24 Although redaction will serve to protect the identity of the patients in this case, we also note that in some cases the prospect of preserving anonymity through redaction may be too uncertain to permit the produc-

tion of redacted records. For instance, in *Bennett v. Fieser,* a plaintiff sought the medical records of a burn patient who, upon arriving at the medical facility, allegedly diverted the attention of the doctor from the plaintiff. 152 F.R.D. 641, 642 (D.Kan.1994). Due to the specific nature of the injury and potential publicity of the event, the court found that "providing medical records with names and identifying information removed could nonetheless provide vital clues which would assist a party in identifying the non-party patient." *Id.* at 643. Courts must be cautious when analyzing the information so as to determine the appropriate method and level of redaction, if any at all, which would be sufficient to avoid offending the physician-patient privilege. *See, e.g., Parkson v. Cent. DuPage Hosp.,* 105 Ill.App.3d 850, 61 Ill.Dec. 651, 435 N.E.2d 140, 144 (1982) ("Whether the patients' identities would remain confidential by the exclusion of their names and identifying numbers is questionable at best.").

¶ 25 The district court properly noted that the circumstances of this case indicate that redaction will adequately protect patient identities. St. Mark's Hospital is located in Salt Lake County, an area that, according to a U.S. Census for the year 2000, is home to nearly 900,000 people.[1] Furthermore, St. Mark's is one of several hospitals in the region that provides medical care to patients from many neighboring counties and states, thereby increasing the likelihood of preserving anonymity of patients through redaction. Finally, Ms. Staley has limited the scope of her request to patient records for the period following their surgeries and to records revealing their acuities while on floor Four West. In sum, to deduce the name of the six patients receiving treatment on floor Four West during the evening of April 10, 2003, would be extremely difficult if not entirely impossible. Where redaction of personal information will prevent identification of the patient connected to the medical information, the redacted information is not subject to rule 506(b).

¶ 26 Finally, St. Mark's requests that the six patients at least "[be] afforded [the] required opportunity to protect the confiden-

tiality of their medical records." St. Mark's relies on the holding of *Debry v. Goates,* 2000 UT App 58, 999 P.2d 582, and *State v. Yount,* 2008 UT App 102, 182 P.3d 405, for this assertion. These cases have little relevance in this setting.

¶ 27 In *Debry,* the court of appeals stated that prior to disclosing confidential patient information, the patient "must at least be afforded the opportunity for protection" by receiving prior notification of the pending disclosure. 2000 UT App 58, ¶ 16, 999 P.2d 582. But the *Debry* court was addressing a specific request to find information regarding a specific patient's identity and that patient's medical information. *Id.* ¶ 5. Ms. Staley seeks only redacted medical information under limited review free of content that might reveal patient identities. Hence, the arguments in *Debry* do not apply to this case.

¶ 28 In *Yount,* the court of appeals similarly held that a patient's right to notice "does not change even where the records allegedly contain communications that qualify as an exception to the physician-patient privilege." 2008 UT App 102, ¶ 15, 182 P.3d 405. The records sought by the State in *Yount* clearly disclosed the identity of the patient. *Id.* ¶ 6. The court of appeals held that although the records would likely fall within an exception to rule 506, Mr. Yount was entitled to notice before the records were produced pursuant to the subpoena. *Id.* ¶ 16. The issue in *Yount* has no bearing on this case.

## II. THE PATIENT MEDICAL RECORDS ARE RELEVANT TO MS. STALEY'S CLAIMS

¶ 29 St. Mark's argues that even if the records are admissible under rule 506, the six patient records are not relevant to Ms. Staley's claim. Specifically, St. Mark's asserts three arguments against the relevancy of the six patient charts: (1) that Ms. Staley is creating a new and unauthorized exception to rule 506 of the Utah Rules of Evidence; (2) that the doctrine of respondeat superior already holds St. Mark's responsible for Ms. Stallings' negligence towards Ms. Staley, and that, consequently, the other patient charts are irrelevant as they do not

1. *See* U.S. Bureau of Census, DP–1 Profile of General Demographic Characteristics: 2000, Data Set: Census 2000 Summary File 1 (SF 1) and Summary File 3 (SF 3), *available at* http://quickfacts.census.gov/qfd/states/49/49035.html.

specifically deal with Ms. Stallings' negligence towards Ms. Staley; and (3) that the six patient charts are not necessary to support a punitive damages claim.

¶ 30 As to the first argument, our preceding discussion makes clear that rule 506 does not apply where the records have been redacted so that the patient's identity cannot be discovered. As to the second and third arguments, we find the six patient charts are relevant both to an individual claim of negligence against Ms. Stallings that holds St. Mark's liable via respondeat superior, as well as to a punitive damages claim against St. Mark's for grossly negligent staffing decisions. Specifically, the six patient charts contain patient acuity information which, upon review, could indicate that Ms. Stallings was well within her abilities to care for Ms. Staley yet neglected to do so. This information could go directly to proving negligence on behalf of Ms. Stallings herself. Regarding a punitive damages claim, the six patient charts could indicate that St. Mark's knowingly understaffed the nursing care of floor Four West even after learning that the conditions of the patients were extremely acute and required greater care. This could show that Ms. Stallings was negligent because St. Mark's knowingly overburdened her.

 ¶ 31 St. Mark's also argues that Ms. Staley's negligent staffing claim adds nothing to her negligence cause of action. It argues that "because [it] has already admitted its responsibility for the acts/omission of Nurse Stallings in her care of [Ms. Staley], there is no basis for [Ms. Staley's] understaffing claim." We find that this argument was not properly preserved before the trial court. "[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue. This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding." *State ex rel. K.F.*, 2009 UT 4, ¶ 62, 201 P.3d 985 (internal quotation marks omitted)(second alteration in original). Inasmuch as St. Mark's has failed to preserve this argument by presenting it to the trial court, we decline to reach the merit of this question on appeal. *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346.

## CONCLUSION

¶ 32 Because rule 506(b) is not applicable where the names of the patients have been redacted in a way that adequately prevents the patients from being identified, and because the information sought is relevant to Ms. Staley's claim, we affirm the district court's ruling and order St. Mark's to disclose properly redacted copies of the medical records of the six patients for whom Ms. Stallings provided care during the evening in question.

¶ 33 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice PARRISH concur in Justice NEHRING's opinion.