2011 UT App 70

**George M. OLSEN, Petitioner,**

v.

**LABOR COMMISSION, Employers' Reinsurance Fund, Utah Concrete Pipe Co., and Continental Insurance Co., Respondents.**

**No. 20100163–CA.**

Court of Appeals of Utah.

March 10, 2011.

Aaron J. Prisbrey, St. George, for Petitioner.

Edwin C. Barnes, Wendy Bowden Crowther, and Robert D. Andreasen, Salt Lake City, for Respondent Employers' Reinsurance Fund.

Alan L. Hennebold, Salt Lake City, for Respondent Labor Commission.

Thomas C. Sturdy, Salt Lake City, for Respondents Utah Concrete Pipe Co. and Continental Insurance Co.

Before Judges DAVIS, McHUGH, and VOROS.

## OPINION

DAVIS, Presiding Judge:

¶ 1 George M. Olsen challenges the Utah Labor Commission's (the Commission) denial of permanent total disability benefits relating to his 1963 industrial injury. We affirm.

## BACKGROUND

¶ 2 On November 6, 1963, while working as a supervisor at Utah Concrete Pipe Co. (Utah Concrete), Olsen's arm was caught in the mechanism of a conveyor belt while he was attempting to clear away some debris caught in one of the rollers. Olsen's right arm was amputated below the elbow in the accident, but he returned to work seven days later. Olsen continued to work for Utah Concrete until 1969. He then accepted a job in California doing the same type of work. After six-and-one-half years in California, Olsen was induced to return to Utah Concrete, where he remained until his retirement in 1986 at the age of sixty-two.

¶ 3 In 2006, nearly twenty years after his retirement and forty-three years after the accident, Olsen filed an application for hearing requesting permanent total disability benefits, claiming that his 1963 industrial injury had caused him to be unable to work since the time of his retirement. Utah Concrete contested this claim, arguing that any disability Olsen may have had was not the result of his industrial accident, as evidenced by the fact that he had continued to work until retirement age following the accident.

¶ 4 A hearing was held before an administrative law judge on September 15, 2006. Olsen testified that although he continued to work, his job was more difficult after his accident. In particular, because he was right-handed and now had to write with his left hand, it took him an additional two or three hours each day to complete his production reports, increasing his work day from nine or ten hours before the accident to twelve hours after the accident. Additionally, although his supervisory job did not regularly involve manual labor, he was responsible for training new employees, which required him to demonstrate a variety of physical tasks and "had an impact on [his] arm." Olsen testified that he has a "constant pain in [his] right arm," which he rated as five on a scale from zero to ten, and that his pain increases with activity. Olsen testified that the pain in his arm did not increase between the time of the accident and the time he retired, stating that "it's been a fairly constant thing from day one." He has also had periodic infections in his arm that have cleared up with antibiotics. He takes only Tylenol for pain, electing not to take the more potent pain killers he has been prescribed because they have an "adverse effect" on him.

¶ 5 When Olsen took early retirement at age sixty-two, he accepted lower Social Security and company retirement benefits. He testified that his reason for retiring was that he "was having a lot of difficulty with [his right arm], with the stress, [and] with the pain" and that he "was going downhill physically." He also testified that it had been his goal to make it to age sixty-two before retiring. Two years prior to his retirement, Olsen discussed his intention to retire with his manager, telling him that he "was having constant problems with ... infection, right arm infection, and constant pain, constant frustrations" and that he "wanted to get away from it ... [and] couldn't deal with it." Six months prior to his retirement, Olsen sent a letter to his manager, formally giving

notice that he intended to take early retirement "due to some health problems that were not responding to medical treatment." The letter did not specifically mention any problems with Olsen's arm.

¶ 6 Olsen testified that as he got older, it was more difficult to work the high number of hours required of him. He also indicated that when Utah Concrete began acquiring other companies, he was required to travel throughout the country to evaluate the target businesses and that his work would pile up while he was away because there was no one else assigned to take care of it. He testified that the supervisory job he held was so stressful that "many superintendents [keeled] over with heart attacks and died" and that at the time of his retirement, he "was having to go to the doctor about a lot of problems." Olsen had part of his thyroid removed in 1956, was diagnosed with a heart arrhythmia in 1981, and suffers from hypertension. In the years following his retirement, Olsen was implanted with a pacemaker and was diagnosed with prostate and colon cancer.

¶ 7 Olsen testified that he was still capable of doing his job at Utah Concrete at the time of his retirement, that he was never made aware of any problems with his performance, and that Utah Concrete wanted him to come back to work for them. However, he testified that he could not do his job without pain. Following his retirement, Olsen was hired as a consultant for Utah Concrete on two different occasions, once for six weeks and once for three weeks. He has not had any other employment since his retirement. Olsen testified that after his retirement, he continued to do household chores and served a one-year church mission with his wife. He also traveled to Hong Kong, Japan, Taiwan, Korea, Mexico, Germany, Belgium, Holland, France, and Switzerland between 1983 and 1988.

¶ 8 In 2006, Olsen asked two doctors who treated him in the years following his amputation, Dr. Lewis and Dr. Hunter, to prepare "Summary of Medical Record" forms indicating their opinion regarding the effect of his amputation on his ability to work. Both doctors indicated that they believed Olsen was permanently and totally disabled as a result of the amputation.

¶ 9 The administrative law judge denied Olsen's claim, and Olsen thereafter filed a motion for review with the Commission. The Commission found that despite Olsen's injury, he had achieved a long and successful career and his skills continued to be in demand following his retirement. The Commission also found that the pain in Olsen's arm was only one of a variety of factors influencing his decision to retire. The Commission thus concluded that Olsen failed to establish that there was no regular, dependable work available to him as a result of his industrial accident. Olsen now seeks review of the Commission's decision.

ISSUES AND STANDARDS OF REVIEW

■ ¶ 10 Olsen first challenges the factual findings of the Commission. "Whether the findings [of fact] are adequate is . . . a legal determination that requires no deference to the Commission." *Adams v. Board of Review of the Indus. Comm'n*, 821 P.2d 1, 4 (Utah Ct.App.1991). However, "we will change a factual finding only if it is not supported by substantial evidence when viewed in light of the whole record before the court." *King v. Industrial Comm'n*, 850 P.2d 1281, 1285 (Utah Ct.App.1993) (internal quotation marks omitted); *see also* Utah Code Ann. § 63G–4–403(4)(g) (2008).

■ ¶ 11 Second, Olsen argues that the Commission erred in interpreting and applying the "odd-lot" [1] doctrine to the facts of this case. "The standard we apply when reviewing an agency's interpretation of general law

---

1. This somewhat " 'undignified phrase,' " coined by Judge Moulton in the English case of *Cardiff Corp. v. Hall*, (1911) 1 K.B. 1009, refers to the circumstance where, as a result of a worker's industrial accident, " 'the capacities for work left to him fit him only for special uses and do not, so to speak, make his powers of labour a merchantable article in some of the well known lines of

the labour market.' " *Hoskings v. Industrial Comm'n*, 918 P.2d 150, 154 n. 3 (Utah Ct.App. 1996) (quoting *Cardiff*, 1 K.B. at 1020–21). As such, his " 'labour [is] in the position of an 'odd lot' in the labour market, [and] the employer must show that a customer can be found who will take it.' " *Id.* (quoting *Cardiff*, 1 K.B. at 1020–21).

including case law . . . is a correction of error standard, giving no deference to the agency's decision." *Exxon Corp. v. Utah State Tax Comm'n*, 2010 UT 16, ¶ 6, 228 P.3d 1246 (internal quotation marks omitted). "When an agency has discretion to apply its factual findings to the law, we will not disturb the agency's application unless its determination exceeds the bounds of reasonableness and rationality." *Smith v. Mity Lite*, 939 P.2d 684, 686 (Utah Ct.App.1997) (internal quotation marks omitted).

¶ 12 Finally, Olsen argues that his due process rights were violated when the Commission took over thirty-eight months to issue a decision in his case, despite language in the Utah Administrative Procedures Act requiring agencies to issue decisions "[w]ithin a reasonable time after the hearing," Utah Code Ann. § 63G–4–208(1) (2008). Olsen is entitled to relief if the Commission "failed to follow prescribed procedure" and he was "substantially prejudiced" by that failure. *Id.* § 63G–4–403(4), (4)(e).

## ANALYSIS

### I. The Commission's Factual Findings

¶ 13 Olsen argues that the Commission's factual findings were inadequate to support its conclusions. "The question of whether the Commission's action constitutes arbitrary action for want of adequate findings is governed by our determination of whether this court is able to conduct a meaningful review." *Adams*, 821 P.2d at 4. In order to be adequate, the findings must therefore be "sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Id.* (internal quotation marks omitted). An inquiry into the adequacy of the factual findings may be conducted by looking at the Commission's findings and conclusions on their face and determining whether the conclusions logically follow from the factual findings or whether additional findings are needed.

¶ 14 Olsen does not actually make any argument to support his assertion that the findings are inadequate. Rather, he argues that the findings "ignored relevant and criti-cal factual information" regarding the difficulty he encountered in continuing to work and in accomplishing daily activities, the reasons for his retirement, and the determinations of his physicians. This argument constitutes a challenge to the accuracy of the factual findings themselves, not the ability of the findings to adequately support the Commission's conclusion. The Commission's factual findings, derived from its weighing of the evidence, are entitled to some deference. We therefore consider these challenges by determining whether the factual findings are "supported by substantial evidence when viewed in light of the whole record before the court." *King*, 850 P.2d at 1285 (internal quotation marks omitted).

¶ 15 While the Commission may have emphasized some facts in the record over others, its factual findings were supported by substantial evidence. In fact, the evidence Olsen claims the Commission "ignored" was largely incorporated into the findings. The Commission specifically found,

> The loss of his dominant lower right arm caused Mr. Olsen difficulty in some aspects of his personal and work life. It was more difficult for Mr. Olsen to attend to personal matters such as dressing, grooming, and the like. At work, it was time consuming for Mr. Olsen to fill out required reports with his left hand.

However, the Commission found that these difficulties were mitigated by Olsen's development of "adaptive techniques." The Commission found that although "Olsen experienced chronic moderate pain in his arm after his accident, the arm's condition has been essentially stable and he has experienced relatively few medical complications from the injury." All of these findings are supported by substantial evidence in the record.

¶ 16 As to the reasons for Olsen's retirement, the Commission found,

> Mr. Olsen's decision to retire on December 31, 1986, stemmed from several factors. He knew of others his age with similar work responsibilities who he believed had died due to stress. He found it difficult to hire and train new workers. Furthermore, at the time [Utah Concrete] was acquiring other operations throughout

the United States and Mr. Olsen was required to travel to those sites as well as perform his regular work duties. He believed his health was declining. The pain and functional limitations from his work injury added additional burdens. Although Mr. Olsen continued to successfully perform his work duties, over a period of several years he came to the conclusion that it would be prudent for him to retire when he qualified for his company pension and social security retirement benefits.

Mr. Olsen's non-work medical problems include the removal of his thyroid in 1956, several years prior to his work accident. After his retirement at the end of 1986, Mr. Olsen experienced heart arrhythmia[2] and implantation of a pacemaker, prostate cancer, left carpal tunnel syndrome and ganglion cyst, arthritis, depression, and colon polyps.

Although the Commission did not give as much weight to Olsen's assertion that he retired due to pain in his arm as Olsen might have liked, the Commission clearly did not ignore the evidence that the pain was a factor in Olsen's decision to retire, observing that "[t]he pain and functional limitations from his work injury added additional burdens." Although the Commission explicitly acknowledged the difficulties faced by Olsen as a result of his industrial injury, it ultimately concluded that it was "not persuaded" that the pain and challenges from the injury "motivated his decision to retire." The Commission's findings regarding the various reasons for Olsen's retirement are also supported by substantial evidence in the record.

¶ 17 Although Olsen is correct that the Commission did not refer to the statements of Dr. Lewis and Dr. Hunter in its findings, the value of these statements in evaluating Olsen's ability to work at the time of his retirement was questionable, as neither of these physicians had treated Olsen for quite some time prior to his retirement. Dr. Lewis had not examined Olsen since 1972 or 1973,

and Dr. Hunter had not examined Olsen since 1964, six months after the amputation.[3]

## II. Applicability of the Odd–Lot Doctrine

■ ¶ 18 Olsen next argues that he is entitled, under the facts of this case, to permanent total disability benefits by virtue of the odd-lot doctrine, which classifies employees as totally and permanently disabled when they "cannot be rehabilitated and even though not in a state of abject helplessness can no longer perform the duties ... required in [their] occupation[s]." *Marshall v. Industrial Comm'n,* 681 P.2d 208, 212 (Utah 1984) (alterations and omission in original) (internal quotation marks omitted). In applying the odd-lot doctrine, it is not the extent of the employee's physical impairment that is at issue, but the extent to which that impairment affects the employee's ability to return to full employment. *See Smith v. Mity Lite,* 939 P.2d 684, 688 (Utah Ct.App. 1997).

■ ¶ 19 In attempting to demonstrate that he falls into the odd-lot category, it is the burden of the claimant to "present a prima facie case that no regular, dependable work is available to him ... [by] present[ing] evidence that he can no longer perform the duties required in his occupation and that he cannot be rehabilitated to perform some other type of employment." *Peck v. Eimco Process Equip. Co.,* 748 P.2d 572, 575 (Utah 1987) (internal quotation marks omitted). "Once the employee has presented a prima facie case, the burden shifts to the employer to prove the existence of regular, steady work that the employee can perform" given the employee's individual circumstances. *Id.* This is a fact-dependent inquiry that "must be assessed in terms of the specific individual who has suffered a work-related injury, taking into account such factors as age, education, training, and mental capacity." *Id.* at 574; *see also Norton v. Industrial Comm'n,* 728 P.2d 1025, 1027 (Utah 1986) (per curiam) (listing "age, sex, education, economic and

---

**2.** Olsen testified that his heart arrhythmia was diagnosed in 1981, prior to his retirement.

**3.** To the extent that these doctors' statements might have been relevant to determining whether

Olsen's continued employment was the result of superhuman efforts on his part, their exclusion from the Commission's factual findings was harmless. *See infra* ¶¶ 23–25.

social environment, ... [and] permanent impairment" as factors to be weighed (internal quotation marks omitted)).

¶ 20 The fact that an employee returned to work for some period of time following his industrial injury does not automatically preclude him from claiming permanent total disability benefits at a later date if he continues to suffer substantial pain throughout the period of his continued employment or if his industrial injury worsens to the point that he is no longer able to maintain regular employment. *See Norton,* 728 P.2d at 1027–28 (holding that an employee who returned to work for six years following his work-related injury could nevertheless obtain permanent total disability benefits and observing that "[i]t may be years before the effect [of an injury] is felt"). *See generally Hoskings v. Industrial Comm'n,* 918 P.2d 150, 156 n. 7 (Utah Ct.App.1996) ("[C]ourts are careful to avoid penalizing or discouraging a claimant from attempting to rehabilitate himself....."). Under Utah law, a claimant is not required to continue working merely because someone is willing to hire him if he must exert "superhuman efforts ... to rise above his crippling handicaps" in order to do so. *Norton,* 728 P.2d at 1028. Thus, while a claimant's return to work is "one factor to be weighed in determining his disability," it must be considered in concert with "the *condition* under which [the claimant] continued his employment." *Id.* at 1027–28.

¶ 21 Furthermore, the fact that an employee continues working until he is eligible to retire "will not adversely affect a determination of permanent total disability when the employee has demonstrated that his disability from the industrial injury significantly influenced his decision to retire." *Peck,* 748 P.2d at 578. However, we will uphold a denial of benefits based on voluntary retirement "when a finding is made and

supported by evidence that the employee's retirement is not substantially motivated by his industrial injury, but is due primarily to personal or other reasons." *Id.*

¶ 22 Olsen argues that the Commission misapplied the odd-lot doctrine (1) by failing to consider the physical difficulties he faced in his job and the pain he suffered in fulfilling his work duties after losing his arm in evaluating whether his injury precluded him from continuing to work; (2) by determining that he voluntarily retired due to factors apart from his industrial injury; and (3) by failing to consider his disability in the context of "his age, mental capacity, social environment, and medical impairment."

¶ 23 We agree that in evaluating Olsen's ability to continue in his employment the Commission should have considered not only the success and longevity of Olsen's career following his industrial accident, but also "the condition under which [Olsen] continued his employment." [4] *See Norton,* 728 P.2d at 1028 (emphasis omitted). The fact that Olsen "rose to the challenge" presented by his industrial injury does not automatically preclude him from seeking permanent total disability benefits, particularly if doing so required "superhuman efforts" on his part.[5] *See id.* at 1028 ("[The claimant's] decision to return to work did not automatically disqualify him from receiving permanent total disability benefits, where the facts indicate that throughout the remainder of his employ he was not restored to health."). However, the Commission's failure to fully evaluate this factor was harmless because Olsen's claim was properly denied based on his voluntary retirement. Additionally, Olsen failed to make out a prima facie case that he fell into the odd-lot category because he presented no evidence that he could not be rehabilitated to perform other work.

---

4. It is particularly necessary to consider the conditions of employment where an employee's condition worsens over the course of his continued employment. *Cf. Norton v. Industrial Comm'n,* 728 P.2d 1025, 1026 (Utah 1986) (per curiam) (reciting facts showing that employee's symptoms worsened over the course of the six years he continued to work prior to his retirement).

5. Nevertheless, the fact that Olsen continued to work in the same occupation for twenty-three years following his industrial accident may be weighed in evaluating whether his injury was so crippling that he could continue working only by exerting superhuman efforts.

¶ 24 While there was certainly evidence indicating that Olsen's pain was a major factor in his decision to retire, there was also substantial evidence, accurately recited in the Commission's findings, supporting alternative motivations. The factual findings made by the Commission are sufficiently detailed to provide "a logical and legal basis for the ultimate conclusion[ ]" that Olsen's decision to retire was not substantially motivated by his industrial injury. *See Milne Truck Lines, Inc. v. Public Serv. Comm'n,* 720 P.2d 1373, 1378 (Utah 1986). The Commission's detailed findings discussing numerous factors affecting Olsen's decision to retire make it clear that the Commission's decision was not based merely on the fact that Olsen waited to quit working until he was eligible to retire. *Cf. Peck v. Eimco Process Equip. Co.,* 748 P.2d 572, 579 (Utah 1987) (rejecting the Commission's denial of permanent total disability benefits because it was based solely on the Commission's finding that the claimant was able to work effectively for a year following his accident and "just plain retired" after turning sixty-five (internal quotation marks omitted)). Given the various factors listed in the Commission's findings, the Commission's conclusion that it was "not persuaded" that Olsen's industrial injury "motivated his decision to retire" was not beyond the realm of reasonableness and rationality. The Commission's finding of voluntary retirement motivated "primarily [by] personal or other reasons" is a sufficient basis for denying benefits under the odd-lot doctrine. *See id.* at 578.

¶ 25 Additionally, although Olsen presented at least some evidence that his injury kept him from continuing with his job at Utah Concrete, he presented no evidence indicating that he could not be rehabilitated to perform a different job. *See id.* at 575 (stating the rule that it is the claimant's burden to "present a prima facie case that no regular, dependable work is available to him ... [by] present[ing] evidence that he can no longer perform the duties required in his occupation *and* that he cannot be rehabilitated to perform some other type of employment" (emphasis added)); *cf. id.* at 574 (noting that the Division of Rehabilitation Services had made a determination that claimant was not a good candidate for rehabilitation); *Norton v. Industrial Comm'n,* 728 P.2d 1025, 1027 (Utah 1986) (per curiam) (accepting an evaluation by the Division of Vocational Rehabilitation as prima facie evidence that the claimant could not obtain other employment). Olsen completed approximately three years of college, and his position at Utah Concrete was supervisory. The tasks he cited as causing him pain or difficulty included filling out reports and training new employees. However, it is conceivable that Olsen could have been hired for a different job that did not require him to fulfill such tasks. In fact, Olsen testified that when he worked in California, he had a secretary who filled out the reports for him and that he was not required to put in as many hours at that job as he was at Utah Concrete. He also testified that he was hired by Utah Concrete for short periods after his retirement as a consultant, which included work designing a piece of equipment. The Commission's finding that "Olsen was a competent and sought-after management employee throughout the period of his active employment and afterwards during his retirement" is supported by the record and suggests that Olsen may have been able to find less demanding employment. In any case, because Olsen has presented no evidence to the contrary, he has not met his burden to prove that he could not be rehabilitated. Having failed to meet his burden of proof, Olsen could not obtain permanent total disability benefits under the odd-lot doctrine. This failure also obviated the need for the Commission to consider additional contextual factors such as Olsen's "age, education, training, and mental capacity" affecting his ability to continue working or to be rehabilitated, *see Peck,* 748 P.2d at 574.

### III. Delay in Issuing Opinion

¶ 26 Finally, Olsen argues that the thirty-eight months it took for his appeal to be processed by the Commission violated his due process rights. The Utah Administrative Procedures Act requires that administrative agencies issue signed orders "[w]ithin a reasonable time after the hearing." Utah Code Ann. § 63G–4–208(1) (2008). This court has previously upheld the grant of a petition for extraordinary relief compelling

the issuance of an administrative decision following a seventeen-month delay. *See Rice v. Utah Sec. Div.*, 2004 UT App 215, ¶¶ 2, 10, 95 P.3d 1169. While we agree that a delay of thirty-eight months in issuing an administrative decision is unreasonable under the facts of this case, Olsen never brought this issue to the Commission's attention. Where he permitted the Commission to delay its decision, without objection, for thirty-eight months, Olsen cannot now claim on appeal that his due process rights were violated. *See generally In re K.F.*, 2009 UT 4, ¶ 62, 201 P.3d 985 ("[I]n order to preserve an issue for appeal[,] the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." (second alteration in original) (internal quotation marks omitted)); *Nebeker v. Utah State Tax Comm'n*, 2001 UT 74, ¶ 20, 34 P.3d 180 ("[P]arties must raise constitutional claims in the first instance before the agency."). Furthermore, Olsen was not prejudiced by the delay because the Commission's decision appropriately affirmed the decision of the administrative law judge. *See generally* Utah Code Ann. § 63G–4–403(4) (2008) ("The appellate court shall grant relief [for an agency's failure to follow prescribed procedure] *only* if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced . . . ." (emphasis added)).

¶ 27 Notwithstanding our conclusion that Olsen is not entitled to relief due to agency delay, we are concerned about the impact such an extensive time for making a decision may have on a claimant who has been erroneously denied benefits. The Workers' Compensation Act's purpose of providing a speedy and inexpensive way for employees to be compensated for job-related injuries, offered in exchange for the forfeiture of the right to seek tort damages, *see* Utah Code Ann. § 34A–2–105(1) (Supp.2010) (making recovery under the Workers' Compensation Act the exclusive remedy for work-related injuries), is not met in such circumstances. *See generally Merrill v. Utah Labor Comm'n*, 2009 UT 26, ¶ 24, 223 P.3d 1089 ("The Workers' Compensation Act was enacted to assure the injured employee and his family an income during the period of his total disability as well as compensation for any resulting permanent disability, to eliminate the expenses, delay, and uncertainty of the employee having to prove the employer's negligence, and to place the burden of industrial injuries on the industry." (internal quotation marks omitted)); *Woldberg v. Industrial Comm'n*, 74 Utah 309, 279 P. 609, 611 (1929) ("The whole purpose, plan and intent of the [Workers' Compensation] Act is to provide a simple, adequate and speedy means to all applicants for compensation to have their applications heard and determined upon the merits, and to have the acts of the Commission as speedily reviewed by this court by any interested party if he thinks that the Commission has exceeded its powers or has disregarded some provision of the statute." (internal quotation marks omitted)). Rather, unless individually motivated to make pre-decision payments, *see, e.g., Larsen Beverage v. Labor Comm'n*, 2011 UT App 69, ¶ 11 n. 4 (commending employer for entering into a stipulation that permitted the employee to receive benefits while litigation was pending), the employer can pay nothing for years despite the employee's legally compensable claim and current economic need.

## CONCLUSION

¶ 28 The Commission's findings were adequate to support its decision and were supported by substantial evidence. Because the Commission made a specific finding that Olsen's retirement was primarily motivated by factors apart from his industrial injury and because Olsen failed to present a prima facie case that he was unable to be rehabilitated for alternative employment, the Commission did not err in determining that he does not qualify for permanent total disability benefits under the odd-lot doctrine. Finally, Olsen did not preserve his claim that his due process rights were violated by the Commission's delay in issuing a decision, and he was not prejudiced by the delay. We therefore affirm.

¶ 29 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge and J. FREDERIC VOROS JR., Judge.