**2023 UT App 27**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF P.J.R.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

C.S.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20220264-CA
Filed March 23, 2023

Sixth District Juvenile Court, Manti Department
The Honorable Brody L. Keisel
No. 1097003

Emily Adams, Freyja Johnson, and Caleb Proulx,
Attorneys for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DAVID N.
MORTENSEN concurred.

HARRIS, Judge:

¶1     C.S. (Mother) appeals an order terminating her parental
rights regarding P.J.R. (Child). But Mother does not contest the
juvenile court's findings that there were grounds for termination
and that termination was in Child's best interest. Instead, Mother
limits her appellate challenge to the court's determination that the
Division of Child and Family Services (DCFS) made reasonable
efforts, during the course of the case, toward reunification of

Mother and Child. Specifically, she claims that the court applied an incorrect evidentiary standard in arriving at its reasonable efforts determination and—alternatively—challenges the merits of that ultimate determination. We find Mother's arguments unpersuasive, and therefore affirm.

BACKGROUND

¶2    In 2019, DCFS filed a petition seeking protective supervision of Mother's five children, including Child. In the petition, DCFS alleged that Mother had abused and neglected Child, and specifically alleged (among other things) that, during an incident in the waiting room of a family counseling center, Mother "grabbed [Child] by the back-collar area of his shirt in such a manner that it restricted his ability to breathe and caused him to choke," and then "shoved his face into the corner with force." Even after Child "told Mother he was having difficulty breathing and that Mother was hurting him," Mother "did not let up on his shirt or the forcing of his face into the corner." At an ensuing shelter hearing, the juvenile court placed all five children in the temporary custody of DCFS.

¶3    Mother responded to the petition by admitting some of the State's allegations and, with respect to the rest, neither admitting nor denying them; this response resulted in the court deeming the State's allegations true. *See* Utah R. Juv. P. 34(e) ("A respondent may answer by admitting or denying the specific allegations of the petition, or by declining to admit or deny the allegations. Allegations not specifically denied by a respondent shall be deemed true."). On the basis of Mother's responses, the court adjudicated Child as abused and neglected by Mother. Mother appealed that adjudication order, and this court affirmed it but remanded for additional proceedings on issues not material to this appeal. *See In re C.M.R.*, 2020 UT App 114, ¶ 33, 473 P.3d 184.

¶4    Following adjudication, the court issued a disposition order in September 2019, setting the primary permanency goal as

reunification and the concurrent permanency goal as adoption. In connection with setting reunification as the primary permanency goal, the court adopted a service plan—prepared with Mother's input and cooperation—and found, "by clear and convincing evidence," that fulfillment of the plan's terms would "constitute reasonable efforts on the part of . . . DCFS to finalize the permanency goals," including reunification. Among other things, the plan required DCFS to "follow up with [Child]'s therapist to monitor his progress in therapy," to follow up with Mother's therapist regarding her treatment, to promptly communicate with Mother, to "assess [Mother]'s increase in parenting skills during supervised parent-time," and to ensure that Child's living, academic, and health needs were being addressed.

¶5     As the case progressed, friction arose between Mother and the DCFS caseworker. As Mother showed at trial, the conflict became apparent at one supervised visit between Mother and her daughters; in a "heated interaction," the caseworker cut the visit short after observing Mother say certain things to her daughters that the caseworker deemed inappropriate. On a later occasion, the caseworker sent a text message to the guardian ad litem lamenting the fact that Mother received visitation with one of her daughters at all, noting that "[t]hese kids have been the victims of severe physical and emotional abuse for years." Eventually, Mother refused to communicate with the caseworker (other than by text message) without her attorney present. Even the State's attorney noticed that the caseworker was having a hard time keeping her "emotions out of this case," and admonished the caseworker to be more circumspect in her communication.

¶6     Mother also came to believe that the caseworker was interfering with family therapy during the course of the case. Under the service plan, family therapy involving Mother and Child was to begin when Mother's and Child's therapists both recommended it, and the caseworker was supposed to follow up with both therapists. In December 2019, the caseworker apparently told Mother that Child's therapist did not recommend face-to-face visits when, in fact, the caseworker had not yet

communicated with Child's therapist. The first documented communication between the caseworker and Child's therapist about family therapy was in June 2020, about nine months after the service plan was put in place. However, some evidence shows that the caseworker had "reached out to [Child]'s therapist regularly throughout the case," and that as of May 2020, Child's therapist did not "recommend family therapy with [Mother] at this time." But when the caseworker was asked at trial whether she communicated with Child's therapist prior to June 2020, she stated that she did not recall. When the caseworker did reach out to Child's therapist inquiring about family therapy, the therapist responded that before family therapy would be recommended, Mother would need to take a parenting course, continue her own therapy, and "take[] accountability for her actions and . . . learn[] . . . to regulate her own emotions."

¶7 Shortly thereafter, Mother complained that the caseworker might be attempting to influence the therapists away from holding family therapy, and the caseworker then told the therapists that the court had instructed her to tell them that they were to communicate with each other (rather than through the caseworker as an intermediary) about "whether family therapy with [Mother] and [Child] would be in [Child's] best interest." By this point, Child's therapist had come to believe that family therapy was now appropriate, and expressed interest in beginning the process. The caseworker said she would follow up to see whether Mother and Child were making progress from the therapy, but—apparently in response to Mother's request that DCFS "back off"—she stated that she would "not be a part of the scheduling process."

¶8 In August 2020, the caseworker learned that criminal charges had been filed against Mother, and informed the therapists of this fact. Mother believes that the caseworker implied that the conduct in question had occurred recently, when it had actually occurred prior to removal of the children from Mother's care. After the therapists learned of the charges,

communication between them seemed to halt, and family therapy between Mother and Child never did take place.

¶9 During the reunification period, the court held periodic review hearings to assess Mother's progress under the service plan; at some of these hearings, Mother voiced concerns about the fact that family therapy was not occurring, and on other occasions she expressed concerns about certain statements the caseworker was alleged to have made. But for the most part Mother was non-specific about what else DCFS could have done to improve its efforts; indeed, on at least one occasion, the court expressly asked Mother's attorney if "there's anything else . . . as far as services go . . . that could be provided by [DCFS]," or if there was "anything else that you think [DCFS] should be providing to help [Mother] complete the service plan," and counsel responded that he did not "have any specific request of [the court] right now." The most specific complaint Mother raised was in August 2020 when she filed a "motion to take evidence and make findings regarding reasonable efforts" in which she accused DCFS of "hostility" and "actively work[ing] against the reunification goal."

¶10 But by the time this motion was filed, the court had already made—on several different occasions during the reunification period—specific findings that DCFS was making reasonable efforts toward accomplishing the stated permanency goals, including reunification. For instance, in November 2019, the court after a hearing found that "DCFS has provided and is providing reasonable efforts to finalize the permanency goals." Several months later, the court made a similar finding, noting along the way that Mother's attorney "could not articulate other efforts that DCFS should be making to further the permanency goals." In August 2020, the court found that "DCFS has and continues to provide reasonable efforts to finalize the child/children's permanency goals and to comply with its court ordered responsibilities." And a few weeks after that, the court did so again, noting that "[n]o party suggested efforts/services that could be provided by DCFS which are not already being

provided." There is no record of Mother making any objection to any of these interim findings regarding reasonable efforts.

¶11 In November 2020, after fourteen months of reunification services and with a permanency hearing looming, the parties engaged in settlement negotiations and entered into a stipulation that resolved many of the issues in the case. The parties and counsel then appeared before the court to put the terms of their stipulation on the record. Following the hearing, counsel for the State prepared an order memorializing the events of that hearing, and circulated it to Mother's counsel for review. Mother's counsel did not object or otherwise comment on the proposed form of the order, and therefore the State submitted it to the court "as being stipulated to," and the court entered it as an order of the court. That order recites that the parties stipulated that "DCFS or other agency/ies continue to make reasonable efforts to assist the family finalize the service plan and its permanency goals." The order recites that the parties also stipulated that the court would "terminate reunification services" as to Child, and that "termination of those services" was in Child's best interest. Based on this stipulation, the court changed Child's primary permanency goal from reunification to adoption. Mother did not object to the terms of this order, either before or after its entry, and did not object to the change in permanency goal.

¶12 Thereafter, the State filed a petition seeking the termination of Mother's parental rights regarding Child. Some months later, the parties again entered into negotiations and agreed to resolve some of the issues surrounding the State's termination petition. In particular, Mother stipulated "to the Court finding that it is in Child's best interests and strictly necessary for the Court to terminate her parental rights should the Court also find legal grounds for terminating her parental rights." After entry of this stipulation, the court scheduled a two-day termination trial to consider whether grounds for termination existed and whether DCFS had made reasonable efforts toward reunification.

¶13 The trial took place in November 2021. When the parties and their attorneys appeared for the first day of trial, the State informed the court that it did not intend to call any witnesses in its case-in-chief and, instead, asked the court to "take judicial notice of all the filings in the . . . case." Mother objected to the court taking judicial notice of such a large quantity of material, arguing that she would never be able to respond to everything in the docket and the court would not have time to review so many documents. Eventually, the State narrowed its request to all the "findings and orders specific to [Child]," and Mother did not object. The court then agreed to take judicial notice of all its interim findings and orders regarding Child. The State then asked the court to take judicial notice of the court-ordered child and family plan pertaining to Child, psychological evaluations of Mother and Child, and court reports pertaining to Child; Mother did not object to the court taking judicial notice of the plan, but did object to the court taking judicial notice of the evaluations and court reports. The court initially took the matter under advisement, but later decided to take judicial notice of the service plan as well as the court reports, reasoning that they had been explicitly incorporated into the court's previous orders and findings. The reports showed efforts the caseworker made, such as visiting all involved parties, providing transportation for Child, inspecting foster parents' and Mother's living situations, communicating with therapists, gauging Mother's progress, promptly communicating with Mother, and ensuring Child had proper educational, medical, and mental health care.

¶14 The State then made its opening statement, pointing out that the only two issues for trial were grounds for termination and reasonable efforts, and arguing that grounds had already been established through the juvenile court's previous adjudication that this court affirmed. Regarding reasonable efforts, the State argued that, throughout the entire proceeding, the juvenile court had periodically and continuously found that DCFS had made reasonable efforts toward reunification. The State also asserted that, at the end of the reunification period, Mother had stipulated—as part of the November 2020 stipulation prior to the

permanency hearing—that DCFS had made reasonable efforts. The State asserted that it had sufficiently proven its case regarding grounds and reasonable efforts through the judicially noticed documents, and it rested its case without calling any witnesses.

¶15 After the State rested, Mother made a "motion for judgment as a matter of law," arguing that the court's previous orders "cannot as a matter of law be relied upon for a finding of reasonable efforts in the context . . . of a termination of parental rights trial" and that these orders were only "interim orders" and "can be revisited." Mother also suggested that she never actually stipulated to a finding of reasonable efforts, even though the court's order—to which she had not objected—stated otherwise. The court took Mother's motion under advisement, and did not ever make an explicit ruling on it, but implicitly denied it by eventually making a ruling on the merits in the State's favor.

¶16 Mother then proceeded with her case-in-chief, in which she called the caseworker and her therapist in addition to presenting her own sworn testimony. The caseworker testified about the events described above, outlining the actions she took to facilitate reunification and discussing her disagreements with Mother. Mother's therapist testified about her sessions with Mother and the progress Mother made through therapy. Mother testified about the events, described above, that caused her to believe that DCFS was not making reasonable efforts toward reunification.

¶17 At the conclusion of trial, the court took the matter under advisement. About three months later, the court issued an oral ruling,[1] concluding that there were grounds to terminate Mother's parental rights, and that the State had demonstrated that DCFS had indeed made reasonable efforts to facilitate reunification. After announcing its ruling, the court instructed the State to prepare an order reflecting the court's ruling. The State did so, and circulated the proposed order to Mother; within her time to

---

1. A transcript of the court's oral ruling was not included in the record submitted to us.

object, Mother filed an objection taking issue with one small part of the order, but did not make any objection to the order's treatment of the proper evidentiary standard.

¶18    Eventually, the court signed a version of the written order prepared by the State, finding "by clear and convincing evidence" that grounds for termination existed because "Child was previously adjudicated to be abused and neglected" in an order that had been affirmed on appeal.

¶19    The court also found—based on "the review hearings, court reports, and other evidence"—that DCFS had provided reasonable efforts toward reunification, although the court did not specify which standard of proof (e.g., clear and convincing evidence or preponderance of the evidence) it was applying with regard to this determination. Among other things, the court found that DCFS had taken action to (i) ensure that Child's medical, dental, and mental health needs were met, (ii) visit Child at placements, (iii) supervise visits, (iv) review education records, (v) transport Child, (vi) communicate with Child's therapist, (vii) "coordinate[] virtual parent-time," (viii) communicate with Mother, and (ix) answer questions and arrange visits. The court also noted that it had, throughout the pendency of the case, "consistently found reasonable efforts on the part of DCFS" in its previous orders and findings. However, the court did not treat these orders and findings as dispositive, and went on to examine the rebuttal evidence offered by Mother, directly addressing her two main arguments: "personal friction between the Mother and [the caseworker], and the delay in starting family therapy with all of the children." Regarding the friction, the court noted that "DCFS cases are almost always high stress situations and there are bound to be disagreements between DCFS and the parent whose rights are at risk." And in this case, the court determined that "[t]he disagreements here were based on the DCFS caseworker's frustration/stress at the lack of progress made by [Mother], which in some sense suggests the DCFS caseworker's desire for [Mother] to progress and move forward toward reunification." Regarding the delay in family therapy, the court

noted that "DCFS regularly reported that they were following up with the therapist and that the strategy taken by the therapist was determined by the therapist, not DCFS," and concluded that, "while there may not have been perfection in the case, . . . DCFS has acted reasonably in their efforts."

¶20 Accordingly, the court entered an order terminating Mother's rights as to Child.

ISSUES AND STANDARDS OF REVIEW

¶21 Mother now appeals from the court's termination order, but her appeal is narrowly targeted. As noted, Mother did not contest best interest at trial, after stipulating that termination of her parental rights to Child would be in Child's best interest. And here on appeal, Mother does not contest the court's determination that grounds for termination existed. She does, however, challenge—in three different ways—the court's determination that DCFS made reasonable efforts toward reunification.

¶22 Her first challenge concerns the evidentiary standard the juvenile court applied in making its reasonable efforts determination. She contends that the court should have, but did not, apply a "clear and convincing evidence" standard in making its reasonable efforts determination. "The applicable burden of proof for termination proceedings is a question of law we review for correctness." *In re G.D.*, 2021 UT 19, ¶ 36, 491 P.3d 867.

¶23 Next, she challenges the merits of the court's reasonable efforts determination, and this challenge has two parts. First, she contends that the court erred in denying her motion, made at the conclusion of the State's case-in-chief, for "judgment as a matter of law." In a bench trial, a motion for judgment as a matter of law's "procedural counterpart," *Grossen v. DeWitt*, 1999 UT App 167, ¶ 8, 982 P.2d 581, is a motion for involuntary dismissal, *In re J.A.*, 2018 UT App 29, ¶ 26, 424 P.3d 913, *cert. denied*, 420 P.3d 704 (Utah 2018). Such a motion "should be granted when the trial judge

finds that the claimant has failed to make out a prima facie case or when the trial judge is not persuaded by the evidence presented." *Accesslex Inst. v. Philpot*, 2023 UT App 21, ¶ 33 (quotation simplified). "Whether a party has established a prima facie case is a question of law which we review for correctness." *In re M.L.*, 965 P.2d 551, 558 (Utah Ct. App. 1998).

¶24 Next, Mother challenges the court's ultimate finding that DCFS made reasonable efforts toward reunification. "A court's determination that DCFS made reasonable efforts to provide reunification services involves an application of statutory law to the facts that presents a mixed question of fact and law, requiring review of the juvenile court's factual findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." *In re N.K.*, 2020 UT App 26, ¶ 15, 461 P.3d 1116 (quotation simplified). "Because reasonableness determinations are fact-intensive, we afford the juvenile court broad discretion in determining whether reasonable reunification efforts were made." *In re S.T.*, 2022 UT App 130, ¶ 17, 521 P.3d 887 (quotation simplified). "Absent a demonstration that the [reasonable efforts] determination was clearly in error, we will not disturb the determination." *In re K.F.*, 2009 UT 4, ¶ 52, 201 P.3d 985 (quotation simplified). "A finding of fact is clearly erroneous only when, in light of the evidence supporting the finding, it is against the clear weight of the evidence." *In re A.W.*, 2018 UT App 217, ¶ 23, 437 P.3d 640 (quotation simplified).

ANALYSIS

¶25 We first address Mother's contention that the juvenile court applied an incorrect evidentiary standard in making its reasonable efforts determination. After that, we address Mother's challenges to the merits of the court's determination. For the reasons that follow, we are unpersuaded by Mother's arguments.

## I. Evidentiary Standard

¶26 Mother's first assertion is that the juvenile court needed to make its reasonable efforts determination by clear and convincing evidence—rather than by the lower preponderance of the evidence standard—and that it did not do so. The first part of Mother's assertion is correct, but the second part is unsupported by the record in this case.

¶27 With regard to what the proper legal standard is, Mother's position is correct: the juvenile court needed to apply the clear and convincing evidence standard in making its reasonable efforts determination. Neither the State nor the guardian ad litem takes issue, in this case, with Mother's position regarding the proper legal standard. And this position is clearly supported by statutory mandate. In all cases in which reunification services are offered, the reasonable efforts determination is a necessary part of the termination inquiry—it is mandated by the statutes governing termination proceedings, *see* Utah Code § 80-4-301(3)(a) (stating that, "in any case in which the juvenile court has directed the division to provide reunification services to a parent, the juvenile court must find that the division made reasonable efforts to provide those services before" terminating parental rights)—and all facts in termination cases must be established by clear and convincing evidence, *see id.* § 80-4-103(2)(a) (commanding juvenile courts, in all termination cases, to "require the petitioner to establish the facts by clear and convincing evidence"); *see also In re Castillo*, 632 P.2d 855, 857 (Utah 1981) (stating that the presumption of parental rights "should be overcome only by clear and convincing evidence"); Utah R. Juv. P. 41(b) (discussing "[t]he burden of proof in matters brought before the juvenile court," and stating that "cases involving the permanent deprivation of parental rights must be proved by clear and convincing evidence unless otherwise provided by law").

¶28 But the other half of Mother's contention—that the juvenile court applied a different standard to its reasonable efforts inquiry—is simply not borne out by the record. As an initial

matter, examination of the court's order indicates that it was generally applying the clear and convincing evidence standard in this termination case. With regard to its determination about grounds for termination, the court specified that it was using the higher evidentiary standard, stating that it "finds that DCFS has proven, by clear and convincing evidence," that grounds for termination are present. And later in its order, it specified that it was making its legal conclusions regarding termination "by clear and convincing evidence." Significantly, nowhere in its order did the court reference, even obliquely, any other evidentiary standard. Moreover, earlier in the case, in the court's September 2019 order approving the service plan, the court had indicated its awareness of the correct evidentiary standard, finding at that point, "by clear and convincing evidence," that fulfillment of the service plan would "constitute reasonable efforts on the part of [DCFS] to finalize the permanency goals."

¶29 Mother points out, however, that—while the court, in its final order, specified that its grounds determination and its legal conclusions were being made by clear and convincing evidence— the court did not specifically indicate that it was making its reasonable efforts determination by clear and convincing evidence. As noted, it did not indicate the application of a *different* evidentiary standard; rather, the reasonable efforts section of the court's final order was simply silent regarding which evidentiary standard was being applied. As Mother sees it, any uncertainty about which standard the court was applying should be held against the court; in particular, she asks us to infer from this uncertainty that the court was applying an evidentiary standard to that section of its analysis that was different from what it specifically applied to the other sections.

¶30 But this is not the way such inferences work. Uncertainty in the record "is not a basis for reversal." *State v. Hummel*, 2017 UT 19, ¶ 82, 393 P.3d 314. Indeed, "[u]ncertainty counts against the appellant, who bears the burden of proof on appeal, and must overcome a presumption of regularity as to the record and decision in the trial court." *Id.* "Thus, a lack of certainty in the

record does not lead to a reversal and new trial; it leads to an affirmance on the ground that the appellant cannot carry [the] burden of proof." *Id.*

¶31 We encountered a similar situation in *Gerwe v. Gerwe*, 2018 UT App 75, 424 P.3d 1113. In that case, a district court determined, after an evidentiary hearing, that a man had fraudulently induced his ex-wife into signing a postnuptial agreement. *Id.* ¶ 3. But in so doing, the court was silent regarding which evidentiary standard it was applying; it "did not expressly state that [the ex-wife] presented clear and convincing evidence of fraudulent inducement," but "it never suggested that a lower standard of proof applied." *Id.* ¶ 13. On that record, we rejected the appellant's assertion of error, stating that a "reviewing court will not presume from a silent record that the court applied an incorrect legal standard but must presume the regularity and validity of the district court's proceedings, and that it applied the correct legal standard, in the absence of evidence to the contrary." *Id.* (quotation simplified). We concluded our analysis by stating that "[b]ecause nothing in the record suggests that the court applied something less than the clear and convincing standard, [the appellant] cannot establish error." *Id.* (quotation simplified).

¶32 So too here. Mother offers no evidence—aside from the uncertainty engendered by silence—that the juvenile court applied an evidentiary standard other than clear and convincing to its reasonable efforts determination. And as in *Gerwe*, this is not enough to satisfy Mother's appellate burden, especially where the court—in two other places in the order—indicated that it *was* applying the clear and convincing standard.[2] On this basis, we

---

2. Moreover, Mother had an opportunity to bring this issue to the court's attention prior to entry of the order. Recall that the court issued an oral ruling, which was then memorialized by the State into a written order and circulated to Mother for her input. Mother filed a limited, targeted objection to one point in the draft order, but—notably—did not raise any objection to the court's

(continued…)

reject Mother's contention that the juvenile court applied an incorrect evidentiary standard.

## II. Reasonable Efforts

¶33 Next, Mother challenges the merits of the juvenile court's reasonable efforts determination, and this challenge has two parts. First, Mother asserts that the court erred in failing to grant the motion she made at the conclusion of the State's case-in-chief. Second, she asserts that the court's ultimate reasonable efforts determination was against the clear weight of the evidence. We address, and reject, each of these arguments, in turn.

### A

¶34 At the end of the State's witness-less case-in-chief, Mother made an oral motion for "judgment as a matter of law." The court took the motion under advisement, but never issued an express ruling on it; the court implicitly denied the motion when it ruled in the State's favor on the merits of the reasonable efforts question. Mother challenges the court's implicit denial of that motion.

---

discussion of the evidentiary standard it was applying to its determinations. Any lack of clarity about the standard being applied could easily have been remedied at that stage. *See Jensen v. Skypark Landowners Ass'n*, 2013 UT App 48, ¶ 6 n.4, 299 P.3d 609 (per curiam) (stating that a party who made "no objection to the form of the order" could not complain, for the first time on appeal, that the order was "vague and ambiguous"), *cert. denied*, 308 P.3d 536 (Utah 2013); *cf. In re K.F.*, 2009 UT 4, ¶ 63, 201 P.3d 985 (stating that "[j]udicial economy would be disserved" by permitting an appellant to bring, "for the first time on appeal," a challenge regarding the adequacy of the court's findings, because such errors are "easy for a trial judge to correct" and are "best corrected when the judge's findings are fresh in the judge's mind," and because "the only likely remedy is merely a remand to the trial court for more detailed findings").

¶35    Although Mother referred to her motion as either a motion for summary judgment or a motion for judgment as a matter of law, in bench trials the proper reference is a motion for involuntary dismissal. *See In re Trujillo*, 2001 UT 38, ¶ 21 n.13, 24 P.3d 972 (stating that "a motion for a directed verdict contemplates only jury trials," and "[i]n the context of a bench trial, the directed verdict's procedural counterpart is a motion for involuntary dismissal"); *accord Accesslex Inst. v. Philpot*, 2023 UT App 21, ¶ 33. As already noted, the relevant question raised by such a motion—at least where the nonmovant bears the burden of proof on the issue at hand—is whether the nonmovant has, during its case-in-chief, made at least a prima facie case in support of its claim. *See Accesslex Inst.*, 2023 UT App 21, ¶ 33 (stating that, where "the party making [the motion] is the party that does not bear the burden of proof," the motion "should be granted when the trial judge finds that the claimant has failed to make out a prima facie case" (quotation simplified)). "A prima facie case has been made when evidence has been received at trial that, in the absence of contrary evidence, would entitle the party having the burden of proof to judgment as a matter of law." *In re J.A.*, 2018 UT App 29, ¶ 27, 424 P.3d 913 (quotation simplified), *cert. denied*, 420 P.3d 704 (Utah 2018). Thus, we must consider whether the State—the nonmovant who bore the burden of proof—made out at least a prima facie case in support of its reasonable efforts claim during its case-in-chief.

¶36    Our supreme court has defined "reasonable efforts" as a "fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights." *In re K.F.*, 2009 UT 4, ¶ 51, 201 P.3d 985 (quotation simplified). Thus, in order to make a prima facie showing with regard to reasonable efforts, the State had to produce evidence that would—at least before consideration of any contrary evidence—show that DCFS had made a fair and serious effort to reunify Mother with Child during the reunification period. As noted, the State called no witnesses in its case-in-chief, choosing instead to rely entirely on documentary evidence that included the juvenile court's previous interim orders and the court reports incorporated into those orders. But

despite this unorthodox approach,[3] in our view the State did enough—on the facts of this particular case—to make at least a prima facie showing in support of its reasonable efforts claim.

¶37 The State's evidence, such as it was, included the juvenile court's interim orders, and those orders indicated that the court, in its ongoing supervisory role over the proceedings during the reunification period, had made multiple and repeated findings that DCFS had engaged in reasonable efforts to further the permanency goals, the primary one of which was reunification. The court never made a contrary finding, despite Mother having registered some dissatisfaction on this point at various stages of the case. Moreover, those interim orders incorporated the court reports, which included detailed accounts of the measures DCFS took to fulfill the requirements of the service plan, including visiting Child, providing transportation for Child, inspecting foster parents' and Mother's living situations, communicating with the therapists, gauging Mother's progress on the service plan, communicating with Mother, and ensuring Child had proper educational, medical, and mental health care. Finally, at the end of the reunification period in November 2020, with a permanency hearing looming, Mother apparently stipulated that "DCFS or other agency/ies continue to make reasonable efforts to assist the family finalize the service plan and its permanency goals." The use of the word "continue" in the stipulation could reasonably be taken to mean that Mother was acknowledging

---

3. It would not have been difficult for the State to call at least one critical live witness—the DCFS caseworker—in support of its reasonable efforts claim. The caseworker was available that day to testify, and indeed *did* testify when she was called to do so by Mother. We do not go very far out onto the proverbial limb by stating that, in most cases, it would be preferable (and, indeed, advisable) for the State, in reasonable efforts cases, to do more than simply rely on previous interim court orders, and we hope that our decision to affirm the juvenile court in this case does not encourage the State to present similarly truncated cases-in-chief in future reasonable efforts cases.

that, throughout the entirety of the reunification period up until the date of the stipulation, DCFS had made reasonable efforts to accomplish the permanency goals, including reunification. Thus, in this particular case, the State's evidentiary presentation, despite its truncated and unorthodox nature, was sufficient to indicate—at least in the absence of Mother's contrary evidence, which had yet to be presented—that DCFS had made a fair and serious effort to reunify Mother with Child.

¶38 We recognize that Mother was eventually able to point to at least some contrary evidence. For instance, Mother put on evidence about the ongoing friction between herself and the DCFS caseworker, and about the issues that came up regarding initiation of family therapy. In addition, Mother had some colorable arguments to make about the November 2020 stipulation, asserting that the parties' actual agreement had not in fact included any stipulation about reasonable efforts and that, if any such stipulation had been reached, its scope was limited. But at the time the court was considering Mother's motion for involuntary dismissal—at the close of the State's case-in-chief—none of that evidence had been presented. And in assessing whether the State had made out a prima facie case regarding reasonable efforts, the court was not supposed to consider whatever contrary evidence Mother might eventually produce. The prima facie case inquiry is simply whether the State produced sufficient evidence, standing on its own and without considering any rebuttal, to support its claim. And on the facts of this unique case, we conclude that it did.

¶39 For these reasons, we discern no error in the juvenile court's implicit denial of Mother's motion for involuntary dismissal made at the conclusion of the State's case-in-chief.

B

¶40 Finally, Mother challenges the juvenile court's ultimate determination, made as factfinder after trial, that DCFS had made reasonable efforts to facilitate reunification. As noted already, we

review this determination deferentially, giving "broad discretion" to the juvenile court "in determining whether reasonable reunification efforts were made." *See In re K.F.*, 2009 UT 4, ¶ 52, 201 P.3d 985; *see also In re A.C.*, 2004 UT App 255, ¶ 12, 97 P.3d 706 (stating that a juvenile court "is in the best position to evaluate the credibility and competence of those who testify regarding the services that were provided" and to assess the reasonable efforts question). *See generally supra* ¶ 24.

¶41 Here, the juvenile court listened to the testimony of Mother, the caseworker, and Mother's therapist, and examined the dozens of exhibits submitted by the parties. This same court had previously been involved in all of the interim review hearings during the reunification period, during which the court assessed DCFS's reasonable efforts throughout the case. In issuing its ultimate determination, the court took its previous orders into account, but correctly did not treat them as completely dispositive of the question; instead, it considered those orders as potentially persuasive evidence supporting the State's position, but evaluated that evidence in the context of the rebuttal evidence Mother offered.[4]

---

4. Considering such orders, as well as Mother's failure to formally object to them, as potentially persuasive but nondispositive evidence appears consistent with previous decisions by this court in reasonable efforts cases. *See In re A.W.*, 2018 UT App 217, ¶ 31, 437 P.3d 640 ("Father also ignores the several times in the record in which the juvenile court made an unchallenged periodic finding—before its termination order—that DCFS had made reasonable efforts to provide him with reunification services."); *see also In re S.T.*, 2022 UT App 130, ¶ 21, 521 P.3d 887 (noting that, "[a]t no point did Mother object to the court's findings or indicate that she needed additional or different services."); *In re A.C.*, 2004 UT App 255, ¶ 17, 97 P.3d 706 ("It is the parent's responsibility to demand services if they are not offered prior to the termination hearing." (quotation simplified)).

¶42    Indeed, the court directly addressed both of Mother's specific arguments: that the "personal friction" between Mother and the caseworker indicated that the caseworker did not make reasonable efforts, and that the caseworker caused delay in the start of family therapy. With regard to the friction, the court rather astutely noted that child welfare cases "are almost always high stress situations and there are bound to be disagreements between DCFS and the parent whose rights are at risk." But the court, after reviewing the friction in the context of the entire case, concluded that the disagreements between Mother and the caseworker, while regrettable, did not rise to the level of indicating that the caseworker had failed to provide reasonable efforts. On this record, we cannot say that such a determination is "against the clear weight of the evidence." *See In re A.W.*, 2018 UT App 217, ¶ 23, 437 P.3d 640.

¶43    With regard to the delay in family therapy, the court noted that, under the service plan, family therapy was not to begin until both Mother's and Child's therapists recommended it, and the court was aware that responsibility for scheduling the therapy sessions, once both therapists were on board, was to be up to the therapists themselves. The court, after reviewing this issue in context, concluded that most of the blame for any delay in family therapy should not be laid at the feet of the caseworker, observing that "DCFS cannot, nor should they be required to hold the hand of every party involved to ensure that those parties are also making some efforts," and ultimately determined that, "while there may not have been perfection in the case, . . . DCFS has acted reasonably in their efforts." On this record, we cannot say that this determination is against the clear weight of the evidence either.

¶44    Accordingly, we discern no abuse of the juvenile court's discretion in its ultimate determination, made as factfinder after trial, that DCFS provided reasonable efforts toward reunification.

CONCLUSION

¶45    Mother has not carried her appellate burden of demonstrating that the juvenile court applied an incorrect evidentiary standard to its reasonable efforts determination. And we reject Mother's challenges to the merits of the court's ultimate determination that DCFS provided reasonable efforts toward reunifying Mother with Child during the reunification period.

¶46    Affirmed.

———————